2022 IL App (2d) 200715
No. 2-20-0715
Opinion filed June 29, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-2716 |
| JOSE B. RODRIGUEZ-ARANDA, | ) ) ) | Honorable Robert Randall Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.
Justices Zenoff[1] and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Jose B. Rodriguez-Aranda, appeals his conviction of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) relating to the stabbing death of his wife, Martina Chagoya-Espinoza. Defendant was sentenced to 40 years' imprisonment. After an Illinois Supreme Court Rule 402 (eff. July 1, 2012) conference, defense counsel represented to the trial court that

_____

[1]Justice Zenoff participated in this appeal, but has since been assigned to the Fourth District Appellate Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

defendant intended to enter a guilty plea, with a 35-year sentencing cap. As the court questioned defendant, who spoke only Spanish, regarding whether he intended to plead guilty, defendant indicated he did not wish to plead guilty and asked for a new attorney, or a new interpreter, or to represent himself. The court denied defendant's request to represent himself, on the ground that, because defendant had schizophrenia, spoke only Spanish, and exhibited unspecified courtroom behavior, he was unable to represent himself. Additionally, prior to trial, defense counsel requested that defendant's hands be unshackled. The court then ordered that one hand be unshackled. Defendant now appeals, arguing that the court erred in denying his request to represent himself and erred in leaving him mostly shackled for the duration of the trial. For the following reasons, we reverse and remand for a new trial.

¶ 2                        I. MOTION TAKEN WITH CASE

¶ 3     As a preliminary matter we address the State's motion to strike the citations contained in footnotes 2-5 of defendant's brief, which reference secondary sources, and any references thereto.

¶ 4     The State argues that these authorities are not proper secondary sources, do not refer to matters over which the court may take judicial notice, and were not presented to the trial court, and therefore should be stricken.

¶ 5     Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) "expresses no restriction on the nature or source of material which may be cited in support of an argument. Whether the authority cited may be nonprecedential, irrelevant, or incomplete will be determined by the reviewing court as a proper consideration in assessing the merits of a proponent's argument." *In re M.M.*, 156 Ill. 2d 53, 56 (1993). Further, while an appellant must preserve issues or claims for appeal, there is no requirement that arguments or authorities be limited strictly to those made at trial. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Accordingly, we deny the State's motion; however, we will take

the State's arguments regarding these authorities into consideration and assign them the weight we believe is appropriate.

¶ 6                                    II. BACKGROUND

¶ 7      On the night of November 20, 2015, after an argument, defendant stabbed his wife 23 times in the chest and face, resulting in her death. Defendant then tried to take his own life, cutting his wrists and throat and stabbing himself several times in the abdomen. Sometime in the early morning hours of November 21, 2015, defendant's son discovered his mother's body, as well as his father, barely conscious in the bathtub. Defendant told his son to call 911 and defendant was taken to the Order of St. Francis Medical Center for treatment. When defendant arrived at the hospital, he had very low blood pressure, had a very high heart rate, and was near death.

¶ 8      After spending over a week in the hospital, defendant was placed under arrest and taken to the Winnebago County Criminal Justice Center on November 30, 2015, by Detective Bob Juanez of the Winnebago County Sheriff's Department. While being transferred, defendant asked Detective Juanez about his children. Detective Juanez informed him they were doing all right, and defendant became emotional, cried a lot, and began repeating, "I can't believe I did this. I can't believe I did this to her. I can't believe I failed my kids." When they arrived at the station, defendant was taken to an interview room and read his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Detective Juanez then proceeded to interview defendant.

¶ 9      In that interview, defendant described how on the night of November 20, 2015, he and his family were watching a movie. He noticed his wife was texting someone and demanded to know who. He believed that she was texting with another man. He had been drinking and, after the children went to sleep, he confronted her about the cellphone messages again, asking her to unlock her phone. She refused loudly; defendant believed she did so in order to wake the children so he

- 3 -

would stop. She said she wanted to leave with the children. He then grabbed a knife and told her to unlock her phone. She refused and went to stand up from the chair she had been sitting in. He then proceeded to stab her. Realizing what he had done, he lowered her to the ground. He cut his wrists and arranged himself and his wife's body as if they were going to sleep. He awoke the next morning. The children were awake, and he told them to stay in their room. He began stabbing himself. He tried to cut himself further but felt the knife was no longer sharp. He grabbed another knife and tried to sharpen the knives. Not much blood was coming out. He passed out and awoke in the kitchen. He took several pills to try and kill himself, and possibly vomited. He remembered going to the bathroom but could not recall anything else from before he awoke in the hospital. The interview and conversations with Detective Juanez were conducted in Spanish.

¶ 10    Defendant was charged in a December 21, 2015, indictment with three counts of first-degree murder.

¶ 11                              A. Dr. Lichtenwald's Report

¶ 12    On September 13, 2016, defendant filed a motion to suppress the statements he made while he was being transported from the hospital and during his November 30, 2015, interview with Detective Juanez. Defendant argued that he could not knowingly and intelligently waive his *Miranda* rights because he had been diagnosed with schizophrenia, he had been prescribed the psychotropic medication Zyprexa, and his suicide attempt left him in a compromised physical state. In support of that motion, defendant sought to have Dr. Meyer interview defendant and prepare a report. The State hired Dr. Lichtenwald to examine defendant and prepare a report regarding his capacity to waive his *Miranda* rights. Dr. Meyer's report was never entered into the record, as defendant chose to withdraw his motion to suppress, but defendant's trial attorney testified in a posttrial hearing that his report was similar to Dr. Lichtenwald's.

¶ 13    Dr. Lichtenwald's report included summaries of his interview with defendant, as well as medical reports from defendant's treatment at the hospital after his suicide attempt and medical records from the jail. According to Dr. Lichtenwald's report, defendant was evaluated at the hospital by psychiatrist Dr. Martin Fields. On November 25, 2015, Dr. Fields noted that defendant was exhibiting "no evidence of psychosis, impaired thinking, or severe depression." On November 27, 2015, his notes indicated that defendant began reporting that he saw people who came through the walls and threatened to kill him. His notes on November 28, 2015, reflect a similar state, though Dr. Fields questioned the veracity of defendant's claims, as his anxiety did not seem high. His notes from November 29, 2015, indicated that defendant's symptoms were worsening, and that he was

"[v]ery delusional, claims that all the staff are out to kill him, that one person here is in communication with his wife and is recording the things done to him, there is a book kept by another person here that is recording things done to him for his children and he wants to see that book."

Dr. Fields diagnosed defendant with paranoid schizophrenia and prescribed Zyprexa.

¶ 14    Progress notes from the Winnebago County Justice Center were likewise provided to Dr. Lichtenwald. Per these notes, on December 1, 2015, defendant denied being suicidal, stating he was suicidal for the first two days after killing his wife, but was no longer so, as he wanted to be there for his children. The notes indicated that defendant "[d]id not present as confused. Thoughts were organized and coherent." Defendant denied being suicidal or mentally ill. A note dated December 9, 2015, indicated that

"[s]ince being incarcerated, he denied auditory or visual hallucinations. He denies feeling paranoid believing others are listening to him, or are reading his thoughts. He states he

feels upset but mostly because of what happened to his wife. *** Assessment: Rule out psychotic Disorder unspecified. [L]ikely acute stress reaction vs. delirium while hospitalized. Monitor closely while tapering off meds."

Another note, dated December 28, 2015, stated that defendant "[h]as been in jail almost one month and off psych meds X 3 weeks. Denies current symptoms, mood, affect, speech, thoughts within normal limits. Psychiatria [*sic*] believes symptoms in hospital were related to the situation." A note dated April 22, 2016, stated that defendant had no reported symptoms of mental illness and could be removed from special housing. The reports continued through to February 13, 2017, with no indication of hallucinations or mental illness.

¶ 15     Dr. Lichtenwald's report ultimately concluded that defendant was competent to waive his *Miranda* rights, stating that his "[j]udgment with regard to decisions affecting his own well-being was good" and "[t]here were no indications that Mr. Rodriguez Aranda was not competent to manage his own affairs."

¶ 16                    B. Defendant Seeks to Represent Himself

¶ 17     The motion to suppress was withdrawn on July 12, 2017. A Rule 402 conference was held on December 15, 2017. As a result of that conference, on May 3, 2018, defense counsel, Shauna Gustafson of the Winnebago Public Defender's Office, stated that defendant would be entering an open plea with an agreement for a sentencing cap of 35 years. After defendant was advised of the charges and the State provided the factual basis for the charges, the trial court asked if defendant intended to accept the plea agreement and plead guilty. Defendant, through the aid of an interpreter, asked if he could say something to the court. The court advised him he should consult with his attorney before saying anything. Defendant refused to consult with counsel and stated,

"I do not want to plead guilty. Please assign me somebody else to represent me because in my case there is a lot of things that they are not clear yet. *** If it's possible; otherwise I can represent myself or somebody else. Can you assign me somebody else that speak the same language? That is a big problem. They say something to me, and then they say something different."

The court asked why he wanted new counsel, and he responded that his counsel had not shown him discovery until the day before and that the cap had been raised from 30 to 35 years. He again requested to represent himself, saying, "I can do it myself. I'm asking you to please give me the right to be represented by another attorney, if it's possible, bilingual, or if you cannot, please give me the chance to represent myself. Thank you."

¶ 18　　The trial court then proceeded to question Gustafson, who stated that she had reviewed discovery with defendant and that the 30-year number represented a counteroffer she proffered to the State, which declined, insisting on a 35-year cap. Gustafson also stated that, to her knowledge, there were no Spanish speaking attorneys in the public defender's office. After conducting its inquiry, the trial court determined that no basis existed for removing the Public Defender's Office or appointing outside counsel. The trial court also commented that, of the three attorneys who were on contract for such purpose, none spoke Spanish. The court then asked defendant if he still wished to represent himself. Defendant responded that if the court could not appoint him a new attorney, he wanted the court to assign a new interpreter (referring to the interpreter from the Public Defender's Office who accompanied Gustafson to the jail). About the interpreter he said,

"She was mean to me. She was pushing me and forcing me. They made me feel with a lot of pressure. I told them I do not want to sign. I told them I do not want to. They were with me for half an hour. I kept telling them I don't want to do it. What they never done it before,

they were doing it just yesterday. They told me, 'We are coming back' but never told me, 'We are coming by with pictures; we are coming by with a computer.' All of that made me feel uncomfortable like I have to do it."

¶ 19    The trial court told defendant that he did not have to plead guilty if he did not want to and that they could proceed to trial. The court also reiterated that it would not appoint new counsel. The court again asked if defendant wished to represent himself, and the following exchange occurred.

"THE COURT: Now, you said you want to represent yourself. Is that something you wish to do?

THE DEFENDANT (by means of an INTERPRETER): Well, if I have no other choice, yes.

THE COURT: Well, you are at a significant disadvantage, more so than somebody else that might want to represent themselves because you don't read or speak English and you are in jail. I cannot assign an investigator or an interpreter to sit with you up in jail and review things, read things to you. I don't have an interpreter available for that purpose. If you represent yourself, you are bound by the same rules and conduct that an attorney would be. That means you would have to learn the Rules of Evidence. You would have to learn the Rules of Criminal Procedure. You would have to learn what you have to do to file motions. You would have to be able to do your own legal research. You have to be able to draft pleadings from the Court if you are going to file motions, because all motions have to be in writing.

I can't help you out. I am not allowed to help you out. Anybody who represents themselves, I have to treat them the same that I would treat any attorney. That means I

can't help you even one little bit. If you don't know what you are doing, if you don't know how to do what you are supposed to do, that's your problem. If, for example, you want to get a piece of evidence in and you don't know how to lay the evidentiary foundation, I can't help you. If the State, for example, has a piece of evidence that they are seeking to admit and they don't lay the proper foundation and you don't know enough to object, it would come in. If you represent yourself, you are going to be at a significant disadvantage, aside from the fact that you don't speak English and do not read English, because you are going to be going up against people who have been practicing the law as lawyers for the State's Attorneys' Office for many years. Miss Clifford has tried many, many jury trials. She is one of their most experienced attorneys, as is Miss Gustafson one of the most experienced attorneys in the Public Defenders' Office. Plus you are always at a disadvantage where you are the Defendant trying to represent yourself because you think more with your emotion than you do with your head, and a lot of times people make the wrong decision. They don't make the logical, right decision.

You also need to know that if you do this, *** [the court goes on to describe the charges against him and the possible sentences]. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Have you ever been evaluated for any kind of a mental health problem?

THE INTERPRETER: No; but I do not remember. They are saying that they are showing in discovery [three] different doctors. I just saw [one].

THE COURT: Is there evidence that he's been evaluated by a psychiatrist or psychologist?

MS. CLIFFORD [(ASSISTANT STATE'S ATTORNEY)]: Yes, Your Honor. After he was put in the hospital after this event occurred, he was seen by a psychiatrist, and my recollection of the medical records was that he was diagnosed as schizophrenic, but I don't have all of them in front of me. I don't know what other diagnoses there were.

THE COURT: Miss Gustafson, you would have had access to those records as well. What is your recollection as to what if any diagnoses were made?

MS. GUSTAFSON [(PUBLIC DEFENDER'S OFFICE)]: I believe that that's correct, Judge. He also was assessed pursuant to a motion that Mr. Fuller had filed. I believe that Dr. Lichtenwald met with him at the jail per the State's request, and Dr. Meyer had reviewed the medical per Mr. Fuller's request.

THE COURT: All right. If there's been a diagnosis of schizophrenia, I cannot allow him to represent himself. That type of mental health diagnosis, and I am pretty lenient about allowing people to represent themselves, but that's one of the reasons I cannot.

That coupled with his inability to speak or read English and his incarceration in the County Jail, I am going to deny your request to represent yourself, sir. You are not competent and able to do that, more so than normal because of some of the other problems that you have.

So I am not removing the Public Defenders' Office. I'm not going to grant your request to represent yourself.

Now, I want the attorneys to check into this. If in fact the diagnosis is not schizophrenia, if it is something else, I want to you [*sic*] bring that back to my attention because I may reconsider if he does not have any mental health diagnoses that would impair his ability to represent himself. But with a diagnosis of something like schizophrenia or

bipolar, that is a significant problem as far as somebody's ability to even think rationally at times.

MS. CLIFFORD: That was my recollection based on motions that were filed by Mr. Fuller.

MS. GUSTAFSON: I am not certain as we stand here right now, Judge. I would have to review the medical.

THE COURT: All right. Well, the request to represent yourself is denied for the reasons stated on the record."

¶ 20 The court then stated on the record that it had known the interpreter from the Public Defender's Office for many years and that she was not the type of person who would be mean to or bully defendant. After discussion of administrative and scheduling matters, the following colloquy occurred.

"MS. CLIFFORD: If I can just note, according to my records from Mr. Fuller, the Defendant was diagnosed by Dr. Martin J. Fields with schizophrenia while he was in the hospital in November of 2015 and was prescribed medication including Zyprexa, Z-y-p-r-e-x-a.

THE COURT: All right. And I know that there were evaluations done as was said by Dr. Lichtenwald and Dr. Meyer, although they are psychologists and not psychiatrists. Were there anything in their reports that were inconsistent with those diagnoses?

MS. CLIFFORD: I don't recall Dr. Meyer, but I do remember Dr. Lichtenwald was reviewing for the basis of knowingly or voluntarily.

MS. GUSTAFSON: Those were both in relation to the Motion to Suppress which was withdrawn. Mr. Meyer, I believe, Dr. Meyer was who Mr. Fuller had spoken with. I

believe the State had asked Dr. Lichtenwald to do the evaluation."

¶ 21    Accordingly, a written order was entered that stated as follows,

"Defendant's request to proceed *pro se* is denied for the following reasons:

a) Defendant's inability to read or speak English

b) His incarcerated status and the court's inability to provide a full time Spanish interpreter in jail to read discovery to Defendant, to perform legal research (English language sites), to assist in drafting pleadings and to teach Defendant all applicable laws, rules of evidence and rules of procedure

c) Defendant's disruptive behavior as exhibited in court this date

d) Defendant's mental state as reflected by the prior diagnosis of schizophrenia made previously after this offense allegedly occurred coupled with evidence of his attempted suicide. Based upon the foregoing the court finds Defendant truly lacks the level of appreciation necessary to make a knowing and intelligent waiver of his right to counsel and further that due to the above impediments it is not just a matter of his not being able to do a 'good job' of representing himself but rather he is incapable of doing so and to permit it would result in the inability of the court to ensure orderly fair proceedings."

¶ 22    As court was adjourning, defendant asked the trial court what schizophrenia was. The court informed him that it was not trained in psychiatry but that schizophrenia was a mental health diagnosis, and it recommended he consult the DSM-5 for more information. Defendant apparently took this advice to heart as, according to records from the jail's mental health services clinic, he went there the next day and asked the clinician what schizophrenia was. The clinician explained the disease to him and told him that he had been initially diagnosed with schizophrenia at the

hospital but that "the jail psychiatrist felt it was because of trauma and blood loss as he had no symptoms when taken off meds."

¶ 23    Also on May 4, 2018, a status hearing was held and defendant again expressed his dissatisfaction with Gustafson, saying, "With all respect, Your Honor, I do not want to offend anybody. I don't—I don't feel like I can trust her and that she is representing me the right way. I'm refusing. I have refused for her to represent me, with all respect. I apologize." The trial court again refused to remove Gustafson and the Public Defender's Office and refused to allow defendant to represent himself. It is unclear whether the hearing took place before or after he visited the mental health clinic.

¶ 24                    C. Defendant Remains Partially Shackled at Trial

¶ 25    The case proceeded to a two-day bench trial, held from September 19 to 20, 2018. At the beginning of trial, defense counsel asked that defendant have his hands unshackled for the trial:

> "MS. GUSTAFSON: I would ask the Court, if possible, to have Mr. Aranda unshackled at the hands so that he can take notes during the course of the trial, uh, write down any questions or comments that he has for us. Currently he would be limited in his ability to do that.
>
> THE COURT: I think that seems to be a fair request.
>
> To the officers here—we have two of you—if this were a jury trial, he would be unhandcuffed and unshackled. All I'm asking you to do is uncuff one hand.
>
> Is your client right-handed or left-handed?
>
> (No response.)
>
> THE COURT: Mr. Aranda, do you write with your right hand or the left hand?
>
> THE DEFENDANT: The right one.

THE COURT: Then I would like his right hand unshackled so he can take notes."
The record indicates that, immediately prior to the trial court giving its verdict, defendant had both hands shackled and needed assistance putting on the interpreter's headphones. Defendant was found guilty on all three counts.

¶ 26 Before sentencing, defendant alleged in a posttrial motion that trial counsel was ineffective. As such, the trial court appointed conflict counsel to represent defendant on his posttrial motions. Conflict counsel filed a motion for a new trial, alleging *inter alia* that trial counsel was ineffective, the trial court erred in denying defendant's request to represent himself, and the trial court erred in leaving defendant's left hand shackled at trial.

¶ 27 The trial court denied the motion for a new trial. In doing so, it made the following statement regarding defendant remaining shackled at trial.

"Paragraph 8, 'The Court erred in having the defendant shackled except for one hand to take notes during the trial where the defendant did not pose a threat or escape risk.'

This was a bench trial. This was not a jury trial. In a jury trial the defendant has a right not to be handcuffed or shackled unless it's established that they cannot conduct themselves appropriately, and there has to be a separate hearing held for that.

I'm not aware, nor have I been presented any authority by the defense, that indicates that that right extends to a bench trial.

The underlying reasoning for that right is because you don't want a defendant to be unduly prejudiced in the eyes of a jury. That is not the same concern when there is a bench trial.

I made the decision to keep him handcuffed and shackled, other than allowing him to free one hand so he could take notes. I think that decision was correct. I stand by my

decision, and I'm guessing the appellate court will tell me whether or not I'm right or I'm wrong."

¶ 28     On August 26, 2020, defendant was sentenced to 40 years' imprisonment. Defendant filed a motion to reconsider the sentence, which was denied, and defendant timely appealed.

¶ 29                                       III. ANALYSIS

¶ 30     At issue in this appeal is whether the trial court erred in denying defendant's request to represent himself, and whether the trial court erred by leaving defendant shackled during the trial.

¶ 31                          A. Defendant's Right to Self-Representation

¶ 32     A criminal defendant has the right to self-representation under both the United States and Illinois Constitutions. U.S. Const., amend. VI; *Faretta v. California*, 422 U.S. 806, 819 (1975); Ill. Const. 1970, art. I, § 8; *People v. Simpson*, 204 Ill. 2d 536, 573 (2001).

¶ 33     In order to invoke the right to self-representation a defendant must knowingly and intelligently waive the right to be represented by counsel. *Faretta*, 422 U.S. at 835; *People v. Baez*, 241 Ill. 2d 44, 115-16 (2011). Such waiver must be clear, unequivocal, and unambiguous. *People v. Burton*, 184 Ill. 2d 1, 21 (1998). However, this right is not absolute, and trial courts may deny a defendant's request for self-representation under certain circumstances, including where a defendant's lack of civility and decorum would result in an abuse of the dignity of the courtroom (*People v. Rainey*, 2019 IL App (1st) 160187, ¶ 74), where a defendant abuses the right to waive counsel as a tactic to delay or disrupt proceedings (*Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 162 (2000)), or where a defendant suffers from a severe mental illness and thus is not competent to conduct trial proceedings without counsel (*Indiana v. Edwards*, 554 U.S. 164, 178 (2008)). However, a defendant's lack of legal knowledge and ability is no basis for denying a defendant's request for self-representation. *People v. Albea*, 2017 IL App

(2d) 150598, ¶ 25. A trial court's denial of a defendant's request to represent oneself is reviewed for an abuse of discretion. *Baez*, 241 Ill. 2d at 116. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 34        1. Defendant's Request to Represent Himself was Clear and Unequivocal

¶ 35    The State maintains that defendant did not clearly, unequivocally, and unambiguously request to proceed *pro se* and that his main request was for a new attorney who spoke Spanish, or a new interpreter. Defendant argues that, while it is true that his first request was to be assigned a new attorney who spoke Spanish, he did request to represent himself as a fallback and this was sufficient to waive his right to counsel. In support defendant cites *Rainey*, 2019 IL App (1st) 160187, ¶ 16, for the proposition that a request for self-representation is not unclear or equivocal merely because it is a fallback to a defendant's first choice. In *Rainey*, the defendant had twice waived his right to counsel in order to proceed *pro se* with a public defender ultimately being reassigned to handle his case. *Id.* ¶ 1. During this time, the defendant made it clear that he wanted either the court to appoint him private counsel or to hire private counsel himself. *Id.* ¶¶ 9, 14. After the defendant failed to obtain private counsel, he made a third request to waive counsel, which the court denied. *Id.* ¶ 19.

¶ 36    While the reviewing court ultimately upheld the trial court's denial of the defendant's third request to proceed *pro se*, it held that the mere fact that the defendant would have preferred private counsel did not render his request to represent himself equivocal. "The court thus viewed defendant's request for self-representation as equivocal because it was *conditional*—his second choice, not his preference. The case law has held that line of reasoning to be reversible error." (Emphasis in original.) *Id.* ¶ 66; see also *Freeman v. Pierce*, 878 F.3d 580, 588 (7th Cir. 2017)

(request to represent oneself is not equivocal when accompanied by a request for stand-by counsel, nor when request is made based on dissatisfaction with particular appointed counsel); *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994) ("[A] defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative, simultaneously requests the appointment of new counsel, or uses it as a threat to obtain private counsel."); *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989) (the defendant's request to represent himself if the only alternative was to be represented by the previously appointed public defender was conditional, but not equivocal).

¶ 37    The State maintains that, while a defendant may assert the right to self-representation as a fallback position, defendant's request in this case was anything but clear and unequivocal, emphasizing that most of the hearing focused on defendant's request for a new attorney. While it is true that courts must indulge in every presumption against waiver of counsel (*Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Burton*, 184 Ill. 2d at 23), we disagree with the State that defendant's request to represent himself was not clear and unequivocal. Defendant requested to represent himself three times, and based on the lengthy admonishments provided by the trial court, it clearly understood defendant's request as one to represent himself. See *Rainey*, 2019 IL App (1st) 160187, ¶ 43 (request for self-representation was clear where the trial judge clearly understood the request as such).

¶ 38    We then turn to the basis for the trial court's denial of defendant's request to represent himself. The trial court identified three bases for the denial of defendant's request: his schizophrenia diagnosis, the fact that defendant could not understand English, and his disruptive courtroom behavior.

¶ 39    2. Defendant's Lack of proficiency in English is Not a Basis to Deny Self-Representation

¶ 40    To begin, we address defendant's English proficiency. Defendant maintains that the denial of his request to represent himself based on the fact that he did not speak or read English is akin to a denial based on perceived legal ability, as it spoke not to his ability to knowingly and intelligently waive his right to counsel but, rather, to his ability to conduct a legal defense. The trial court made it clear that its concern regarding defendant's inability to speak or read English was directed toward his ability to prepare an effective defense, stating,

"Well, you are at a significant disadvantage, more so than somebody else that might want to represent themselves because you don't read or speak English and you are in jail. I cannot assign an investigator or an interpreter to sit with you up in jail and review things, read things to you. I don't have an interpreter available for that purpose."

Consequently, the trial court intricately linked defendant's inability to read and speak English to his legal ability to represent himself.

¶ 41    Nonetheless, the denial of a defendant's request to proceed *pro se* cannot be based on the lack of legal knowledge and ability. *Albea*, 2017 IL App (2d) 150598, ¶ 25. The mere fact that the court believes such a decision to be unwise is not a basis for denying a request for self-representation. *Baez*, 241 Ill. 2d at 116. Defendant also argues that he could find no case law that stands for the proposition that a lack of English proficiency could serve as the basis for denying a request for self-representation, and he cites two cases where non-English speakers have been permitted to represent themselves. See *United States v. Torres*, 793 F.2d 436, 438 (1st Cir. 1986) (the defendant who spoke Spanish but not English was permitted to represent himself through the aid of an interpreter.); *Diaz v. State*, 513 So. 2d 1045, 1047 (Fla. 1987) (the trial court did not err in granting Spanish-speaking defendant's request to represent himself, although he required an interpreter). Similarly, illiterate defendants may be permitted to represent themselves. See *People*

*v. Owens*, 2018 IL App (3d) 150616, ¶ 23 (recognizing that the wrong legal standard was applied where the trial court denied the defendant's request to represent himself based on the fact he was illiterate).

¶ 42    The State cites no case that stands for the proposition that the inability to speak English is a valid basis for denying defendant's right to represent himself, nor were we able to locate any case law to that effect. *Cf. United States v. Betancourt-Arretuche*, 933 F.2d 89, 95 (1st Cir. 1991) (neither a lack of education beyond high school nor the inability to speak English are insurmountable barriers to self-representation). Further, the primary evidence in this case consisted of defendant's interview with police, which was in Spanish, and photographs of the crime scene. Accordingly, the fact that defendant spoke and read only Spanish was not a proper basis to deny defendant's request to represent himself.

¶ 43    3. Defendant's Behavior was not so Egregious as to Forfeit his Right to Self-Representation

¶ 44    "A defendant's lack of civility and decorum, unlike his lack of legal ability, is a valid basis for denying his request for self-representation." *Rainey*, 2019 IL App (1st) 160187, ¶ 74. "The kind of misconduct that would justify imposing counsel on an unwilling defendant is, in essentials, the same kind of misconduct that would justify excluding him from his trial." *Id.* ¶ 75. Such misconduct must be "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343 (1970). For example, the defendant in *Rainey* left the courtroom and, upon being brought back by security, launched into a tirade of deeply offensive slurs directed at the judge and his public defender. *Rainey*, 2019 IL App (1st) 160187, ¶ 82. In *Allen*, the defendant argued with the judge in a "most abusive and disrespectful manner" before tearing his file and throwing it on the floor, yelling, "When I go out for lunchtime, you're (the judge) going to be a corpse here." (Internal quotation marks omitted.)

*Allen*, 397 U.S. at 339-40. In *United States v. Brock*, 159 F.3d 1077, 1080 (7th Cir. 1998), the defendant's right to represent himself was revoked when he repeatedly demanded the court provide him with a bill of particulars and state the basis for its authority, and he otherwise declined to answer questions or participate in proceedings despite several contempt findings.

¶ 45   While great deference is afforded to the trial court's observations regarding in court behavior, as the trial court "is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony" (*People v. Radojcic*, 2013 IL 114197, ¶ 34), the record simply does not reflect that defendant's behavior was egregious enough to justify denying him the right to represent himself. Overall, defendant's demeanor throughout the proceedings was polite and respectful. He would often thank the court for considering his motions, or what he had to say. Likewise, he would often raise his hand and wait to be recognized before speaking. At the hearing where defendant requested to proceed representing himself, his behavior was perhaps less respectful than was typical, but nothing reflects that defendant was abusive or insulting toward the court. On two occasions, he was told he needed to slow down or was speaking too quickly. The court also admonished him for interrupting,

> "THE COURT: Stop. I have given you the opportunity to talk. You have interrupted me. You have interrupted Miss Gustafson. When somebody else is speaking, you wait.
>
> THE DEFENDANT: I am sorry."

As the right to represent oneself is a fundamental right, trial courts must be prepared to tolerate a *pro se* defendant with a "rough-around-the-edges demeanor" who engages in some "irritating, foolish, unprofessional, or occasionally wacky behavior." (Internal quotation marks omitted.) *Rainey*, 2019 IL App (1st) 160187, ¶ 76. The record reflects that defendant's behavior was well within those bounds. He did not have to be removed from court, he did not threaten or insult the

court, and he did not refuse to participate in proceedings. In a moment of agitation, he spoke quickly and talked over others in the courtroom. This is not the type of behavior that would justify denying defendant's request to represent himself. Even licensed attorneys must occasionally be instructed to slow down or chastised for interrupting. As such, defendant's courtroom behavior was not a basis for denying his request to represent himself.

¶ 46    4. The Trial Court Failed to Adequately Consider Defendant's Particular Mental Ability

¶ 47    Defendant argues that the trial court erred in denying his request for self-representation based upon a bright-line rule that defendants who have been diagnosed with schizophrenia cannot represent themselves. Defendant argues that under *Godinez v. Moran*, 509 U.S. 389 (1993), the competence to waive counsel is measured by the same standard as the competence to stand trial. Accordingly, defendant maintains that the standard for whether he was fit to represent himself is measured by the same standard as his fitness to stand trial.

¶ 48    On this point, we do not agree. In *Godinez*, the United States Supreme Court clarified that whether a defendant is competent to plead guilty or waive the right to counsel is decided by the same standard as whether the defendant is competent to stand trial. *Id.* at 400-01. That being, "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and a 'rational as well as factual understanding of the proceedings against him.' " *Id.* at 396 (quoting *Dusky v. United States*, 362 U.S. 402 (1960)). However, in order to waive the right to counsel, a defendant must both be competent to do so and knowingly and voluntarily waive the right. *Id.* at 400-01. In that sense, there is a heightened standard, but not a heightened standard of competence. *Id.*

¶ 49    In *Edwards*, the seminal case regarding the rights of mentally ill defendants to represent themselves at trial, the Supreme Court held that "the Constitution permits States to insist upon

representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178. In rendering its decision, the Court made it clear that in *Godinez* it was considering the competency to waive the right to counsel, not the competency to conduct trial proceedings on one's own. *Id.* at 172. Accordingly, the Court recognized a gray area of defendants who were competent to stand trial under *Dusky* (and therefore competent to waive the right to counsel) but who were not competent to conduct trial proceedings themselves. *Id.* at 177-78. As such, the standard for deciding whether defendant was competent to conduct trial proceedings on his own is not the same standard for whether he was fit to stand trial.

¶ 50 We further note that *Edwards* is permissive rather than prescriptive: the trial court may deny a severely mentally ill person from representing himself, however, the trial court is not required to perform an additional inquiry regarding competency before allowing a defendant to represent himself. *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 90.

¶ 51 Defendant further argues that the trial court's bright-line ruling that defendant's schizophrenia diagnosis precluded him from representing himself did not satisfy the type of individualized inquiry contemplated by *Edwards*. Defendant likewise takes issue with the trial court's failure to conduct a further hearing regarding defendant's particular condition rather than relying on the attorneys' passing recollections of Dr. Lichtenwald's report. We agree.

¶ 52 The Supreme Court in *Edwards* took a nuanced view regarding the role mental illness played in a defendant's ability to participate in court. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Edwards*, 554 U.S. at 175. The Court emphasized the importance of taking "realistic account of the particular defendant's mental capacities." *Id.* at 177. "[T]he trial

judge, particularly one such as the trial judge in this case, who presided over one of Edwards' competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.*

¶ 53    While the Court in *Edwards* did not endorse any particular test or factors for trial courts to consider, it did favorably reference a portion of the American Psychiatric Association's *amicus* brief, which stated, "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." (Internal quotation marks omitted.) *Id.* at 176.

¶ 54    While it is certainly true that schizophrenia can constitute a severe mental illness, such that a defendant is not competent to represent himself, a past diagnosis alone may be insufficient to support the denial of a defendant's right to represent himself. In *People v. Washington*, 2016 IL App (1st) 131198, the defendant, who manifested antisocial personality traits, was prescribed antipsychotic medication, and self-reported a diagnosis of paranoid schizophrenia, was found to be fit to represent himself, as he was not delusional or irrational. *Id.* ¶¶ 9, 80.

¶ 55    We agree with defendant that his purported two-year-old diagnosis of schizophrenia was insufficient to support a finding that he was incompetent to conduct trial proceedings on his own, where he was not suffering from any hallucinations or paranoid delusions when he requested self-representation. The trial court made no finding as to how defendant's schizophrenia diagnosis affected his ability to represent himself. There was no mention of any particular symptoms from which defendant was suffering, nor did the court inquire of defendant whether he had any particular symptoms of a severe mental illness. This was far from the fine-tuned mental capacity decision

contemplated by *Edwards*.

¶ 56   For instance, in *Edwards*, the trial court had held three competency hearings for the defendant, who was suffering from schizophrenia, at points finding him incompetent to stand trial and at other points finding him fit for trial. *Edwards*, 554 U.S. at 167-69. The trial court heard testimony from psychiatric and neuropsychological experts. *Id.* Likewise, the trial court had the defendant's *pro se* filings, which were disorganized and incomprehensible. *Id.* at 179, Appendix. Likewise, in *People v. Potochney*, 2022 IL App (2d) 191011-U, ¶ 37, the trial court denied the defendant's request to represent himself in postplea proceedings, where the trial court was aware that the defendant:

> "1) had a prolonged history of experiencing auditory hallucinations; 2) believed he could converse with God and listen to sounds emanating from Hell; 3) had scored below average in cognitive functioning; 4) was—like the defendant in *Edwards*—diagnosed with schizophrenia; 5) had stopped taking his antipsychotic medication despite the reported need for on-going treatment; 6) was previously diagnosed with bipolar disorder; 7) responded to the court's relevant questions in a disjointed, borderline nonsensical manner; 8) could not remember whether he had a mental health diagnosis; and 9) acknowledged that he could not remember the circumstances surrounding his guilty plea."

¶ 57   In the instant case, the trial court did not consider or discuss any particular symptoms that would have made it difficult for defendant to represent himself. Nor was the trial court sufficiently familiar with defendant's mental health. The court relied on the attorneys' passing recollections that defendant had been diagnosed with schizophrenia at some earlier point and the attorneys' offhand recollections that Dr. Lichtenwald's report did not contradict that diagnosis.

¶ 58    From the record, it would appear no one thoroughly examined Dr. Lichtenwald's report. The medical history established from the hospital and jail records did indicate that defendant had been diagnosed with schizophrenia by Dr. Fields, after suffering from hallucinations at the hospital, and was prescribed Zyprexa, a psychotropic medication. However, subsequent medical records from the jail showed that defendant had been reevaluated by the jail psychiatrist, who believed that defendant's symptoms were attributable to acute stress. The report also indicates that defendant had not been taking Zyprexa since early December 2015. Likewise, the medical history showed that he was not suicidal and not experiencing symptoms of mental illness. Lastly, our review of Dr. Lichtenwald's report supports that defendant's past schizophrenia diagnosis did not render defendant unable to represent himself.

¶ 59    The State notes that the trial court also considered defendant's suicide attempt as a basis for denying his request for self-representation. However, it is not clear how defendant's suicide attempt, made nearly two and a half years prior and in the immediate aftermath of having killed his wife, would have affected his present ability to represent himself. There was no indication that defendant was currently suicidal, and, again, the medical history from Dr. Lichtenwald's report indicated that defendant stopped having suicidal ideations within a few days of being admitted to the hospital.

¶ 60    The improper denial of a defendant's right to self-representation is a structural defect that defies harmless error analysis. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."); *People v. Wrice*, 2012 IL 111860, ¶ 66. Accordingly, we find the trial court abused its discretion when it denied defendant's

request to represent himself, based simply on a prior diagnosis of schizophrenia without reviewing all the medical records, including Dr. Lichtenwald's lengthy report, and without otherwise more fully considering defendant's present ability to conduct trial proceedings by himself. We therefore reverse defendant's conviction and remand for a new trial.

¶ 61        B. The Trial Court Erred in Leaving Defendant Partially Shackled at Trial

¶ 62    Having already determined that we must reverse based on the trial court's improper denial of defendant's request for self-representation, we will touch only briefly on the issue of defendant remaining shackled at trial.

¶ 63    "[T]he shackling of the accused should be avoided if possible because: (1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process." *People v. Boose*, 66 Ill. 2d 261, 265 (1977). The trial court asserted that removing defendant's shackles in the instant case was not necessary, as the case was to be decided by a bench trial rather than by jury. This is incorrect. "[E]ven when there is no jury, any unnecessary restraint is impermissible because it hinders the defendant's ability to assist his counsel, runs afoul of the presumption of innocence, and demeans both the defendant and the proceedings." *People v. Allen*, 222 Ill. 2d 340, 346 (2006). Accordingly, the trial court should have either granted defendant's request to unshackle his hands or held a hearing pursuant to Illinois Supreme Court Rule 430 (eff. July 1, 2010), to determine whether restraints were necessary to "protect the security of the court, the proceedings, or to prevent escape."

¶ 64                                III. CONCLUSION

¶ 65    For the reasons stated, we reverse the judgment of the circuit court of Winnebago County, and the cause is remanded for a new trial.

¶ 66    Reversed and remanded.

2022 IL App (2d) 200715

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 15-CF-2716; the Hon. Robert Randall Wilt, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |