2025 IL App (1st) 231193-U

SIXTH DIVISION
January 24, 2025

No. 1-23-1193

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 00246 |
| | ) | |
| TANIKO BOYD, | ) | The Honorable |
| | ) | Angela Munari-Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**.

¶ 1    *Held*:  The judgment of the trial court is affirmed. The trial court did not abuse its discretion when it denied defendant's request for self-representation post-trial, and the *Krankel* hearing sufficiently addressed defendant's ineffective assistance of counsel claims.

¶ 2                               I. BACKGROUND

¶ 3     In 2012, Taniko Boyd was charged by indictment with the attempted first-degree murder of Chicago Police Officers Brian Halloran and Ron Bialota, aggravated discharge of a firearm, armed habitual criminal, unlawful use of a weapon, and aggravated unlawful use of a weapon. In 2013, Boyd was charged with the first-degree murder of Michael White, the attempted first-degree

murder of Yvonne Collins, and aggravated battery of Collins. The trial court granted the State's motion to join the cases because both stemmed from incidents that occurred on October 21, 2012.

¶ 4    On Jan 24, 2013, a public defender (PD) was appointed to represent Boyd. Boyd subsequently obtained private counsel, but she withdrew from the case on March 17, 2014. At that point, Judge Evelyn Clay asked Boyd if he wanted the PD to be reappointed. He responded, "I am making a decision of going *pro se*," but Judge Clay did not hear him. When she asked Boyd a second time if he wanted the PD to be reappointed, he said yes.

¶ 5    On November 17, 2016, Boyd's PD informed the court that Boyd "wishes to represent himself on this matter." The court inquired about Boyd's education level, confirmed he understood the potential penalties if convicted of all charges, and told him,

> "You understand, sir, you will not have the services of the investigators, you will not have stand-by Counsel to assist you with the law, with the rules of evidence, to assist you in getting through the trial and making objections or any of those things that a lawyer would do. You don't have the access to their investigators. Do you understand that? You have none of that. You understand?"

After Boyd confirmed he understood, the court said, "All right. You have a right to represent yourself, sir. **** The Court will allow you to do so. Defendant is *pro se*."

¶ 6    On June 29, 2017, Boyd tendered a motion for appointment of standby counsel, which stated,

> "On November 17, 2016, Defendant was forced to exercise his 6th Amendment constitutional right to self-representation, waiving his right to counsel due to a conflict of interest, where defendant requested that counsel perform specific legal duties and conduct

adequate investigations on defendant['s] behalf to prepare a solid legal strategy, that she refused to consider and/or execute."

The court denied the motion, and told Boyd,

"When you went *pro se,* I think I admonished you that you have the total responsibility for your defense, and you were giving up the services of the [PD] and all of their investigators, et cetera, et cetera. It's all on you to provide for whatever is needed for your defense and to put on your defense. So your motion to put on standby counsel is denied."

After confirming that Boyd wanted to continue representing himself, he proceeded *pro se*.

¶ 7     On July 31, 2017, Judge Angela Munari-Petrone took over the case after Judge Clay retired. On November 9, 2017, the court discussed the option of being represented by counsel with Boyd, stating,

"Presenting your defense as you know is not a simple matter of telling your story. But it requires an adherence to various technical rules governing the conduct of the trial. You know that. In other words, you simply can't get up and tell your story. You have to abide by the all the rules of evidence, the rules of procedure. And I cannot step in and advocate to help you. If I see if you are trying to do something that you don't know exactly how, I am not allowed to be an advocate. I would have to be neutral. A lawyer would have training in trial procedure who could help you. You are going to be up against a prosecutor who is an experienced attorney. And you as the person who is not a lawyer **** [this] might allow the prosecutor an advantage. For example, you might fail to make objections to evidence that is inadmissible. You might not know the proper way to use the voir dire of jurors, the questioning situation of jurors. You might make a tactical

decision that produces an unintended consequence. And if you make a decision, a tactical decision as consequence you didn't want, it wasn't what you were trying to do, you are stuck with that consequence. If you proceed *pro se*, you are not allowed to complain on appeal about the competence or the incompetency of your representation. If you chose to go *pro se* and say you lose and you get sentenced to 75 years or whatever, you can't say on appeal, I didn't know what I was doing. I really wasn't a good lawyer. You give up that right when you chose to go *pro se*. Do you understand that?"

The court went on to note the disadvantages of serving as attorney and a witness, and the fact that a lawyer could come up with defenses or ideas Boyd could not or with ideas on how to present matters that would lead to a lesser sentence if convicted. The court continued,

"And do you understand that if I accept your decision to represent yourself, you will not be given an opportunity to change your mind during the trial. We start the trial and you're representing yourself and then say a day into it you think, oh, this isn't looking good, this isn't going well, I want to take back the decision. I don't want to represent myself anymore, it's too late. I cannot ask a lawyer to step in after the trial has started to try to cleanup what you have done. You're stuck. Do you understand that? **** You are on your own from start to finish and you are stuck with the consequences. Do you understand that?"

Boyd explained some of the issues he had with his former PD, including her failure to contact witnesses and share certain discovery with him, and then asked the court if he could have outside counsel. When the court said this was not an option, Boyd elected to proceed *pro se*.

¶ 8    On March 2, 2018, the court addressed a letter it received from Boyd "because it goes to [his] right to be represented or not." In the letter, Boyd said he "didn't [go *pro se*] as a stall tactic"

but did so was because his PD failed to contact witnesses and share all discovery with him. He again "request[ed] outside representation" because he believed that his "conflict of interest" with his previous PD would "taint" any other PD he received "because, you know, they work together." The court said it would reach out to the PD's office to inquire about Boyd's assertions in order "to resolve this issue" about Boyd's representation.

¶ 9     On March 22, 2018, the supervisor of the murder task force at the PD's office came to speak with Boyd. The court then told Boyd,

> "Before you decide *** that you want to go to trial *pro se* which if you really, really want to, I told you I would let you, your letter indicated to me that the only reason you're doing that is because you are -- there was some conflict with you and [your PD]."

Boyd responded, "Your Honor, with all due respect, I'm declining to be represented – be represented by the [PD's] Office." The court asked Boyd to speak with his former PD before making his final decision to proceed *pro se*, so he did so. After their conversation, however, Boyd stated, "I will proceed to exercise my Sixth Amendment right of self representation."

¶ 10    On August 21, 2019, when the court set trial for October 7, 2019, Boyd stated, "I wanted to put in a request for standby counsel to help me be able to probably, you know, do the cross-examining; and plus, I have – probably like to –" The court cut in and responded,

> "When I first got the case, which was a couple of years ago now, the [PD] that had been assigned to your case came back ****. I asked her to come back with her supervisor and talk to you in the lockup in private more than once because she was more than willing to come back and represent you at the trial. **** We had dealt with your case for four years before you decided to go *pro se* the prior time and you didn't want her. I did my best to convince you that should have a lawyer with you. So I am not going to grant the request

5

> for standby counsel ***. [The PD] was ready, willing and able to come in for you to have a full-time counsel. She's here. She is still in the [PD's] office. She is an excellent lawyer. She was going to come in. She said she met with you and her supervisor talked to you and you declined her service so I cannot appoint standby counsel under those circumstances.
>
> I told you from the start these are very serious charges. You are facing essentially the rest of your life in prison. I could not cajole you anymore to accept the services of an attorney but you repeatedly said you don't want to. I even asked her to come down to speak to you, her supervisor do it so that you will accept them because they are ready to go to trial and you are facing a lot of time. I would rather you have a very good lawyer with you. But to put somebody standby is not fair to the lawyer. I am not going to do it to them, especially when you have a lawyer who is prepared, ready, willing and able to represent you, who knows your case and who is excellent. I can't do it I'm sorry. The request is denied."

¶ 11 Defendant proceeded *pro se*, but on March 3, 2020, filed another motion objecting to the court's decision to deny him stand-by counsel. The motion states, "Judge Petrone['s] judicial determination to force Mr. Boyd to proceed Pro Se is against the federal constitution in her undertaking to support the federal constitution and is an abuse of discretion." Judge Petrone explained that she was

> "going out of my [sic] to accommodate you, because you insisted you wanted to represent yourself, despite the fact that I asked your old [PD] that represented you before to come here and their supervisor to come here and they did. They spoke to you in the lockup, and I did my best to persuade [you] to allow the [PD] to come back and represent you because

the charges were so serious. I continued the case for months. They came and spoke to you in the lockup more than one time to see if you could agree to their representation because they are familiar with the case. **** [Y]ou did not want them. So for that reason I denied you stand-by counsel."

¶ 12    On August 17, 2021, less than a week before Boyd's case was set for trial, Boyd filed a motion for substitution of judge for cause. In it, he said the motion was "not being brought against Judge Petrone because she denied the motions or *** -- as a stall tactic to delay any trial or hearings for any pending motions." Instead, he argued that he was filing the motion

"because I'm telling [Judge Petrone] that I'm not an attorney and I'm not no lawyer. So she telling me that she going to hold me to the standards, and all I want is just a fair trial, and then I'm not going to be able to get that. I understand people appear on their behalf and they represent themselves. I don't have a problem with accepting counsel. I will even, you know what I'm saying, have an attorney that's willing to appear on my behalf."

Judge Thaddeus Wilson denied the motion and transferred the case back to Judge Petrone.

¶ 13    On August 20. 2021, three days before Boyd's case was set for trial, Boyd stated, "I would like to exercise my 6th Amendment Constitutional Right -- 6th Amendment Constitutional Right, Article 168, Illinois Constitutional Right for assistance of Counsel." The court denied his request, explaining that

"[o]n different dates, I have sent for the assistance from the [PD's] Office, Supervisor of the Murder Task Force came down in order to represent you; and you have declined that. I gave you a chance to think about it. I gave you a continuance. I told you you could not continue to go back and forth any more. I find that it is a ploy to negatively affect the effective administration of justice. That is denied. **** See you Monday for Trial."

¶ 14     On Aug 23, 2021, after the State indicated that it was not ready for trial based on the unavailability of a material eyewitness, Boyd stated, "With all due respect, your Honor, as I informed the Court is that when it comes to these proceedings I don't know how to do these proceedings. I don't understand these proceedings." The court explained to Boyd that it

> "went through all of this when you insisted that you represent yourself and I told you, you would not be allowed to claim your own ineffectiveness, your own incompetence and you insisted that you wanted to represent yourself. And I told you, you were going to be stuck with that decision and you are. Did you hire an attorney to be here today?"

After Boyd said he and his family hired new counsel, the court said, "Tell [your new counsel] that this is set for trial October 12th. If he's ready to go to trial October 12th, he can file his appearance." Boyd replied, " I don't know what I'm doing. How she -- I do not understand these proceedings and I'm asking for counsel." When the parties returned to court on September 15, 2021, the court informed Boyd that "the attorney that you said you wanted to have here was in here on another matter ****.  I asked him in the presence of the State if he would be representing you. He said he would not. He said he would not be filing an appearance, he is not representing you. Therefore, you're still proceeding on your own. We have a trial date. I wanted to let you know that that occurred. I will see you for trial." Boyd responded that he had another motion for the assistance of counsel.

¶ 15     On September 20, 2021, the court asked Boyd, "Regarding the motion for appointment of attorney, I would ask that the same attorneys that represented you before if they would even be willing to come back. Do you want me to see if they would be willing to come back?" Boyd said yes. The court then stated, "I want to tell you something, Mr. Boyd. It seems to me like you are stalling repeatedly. Attorney, no attorney, attorney, no attorney, *** for years. This is 2021. You

have been in the county jail since 2013." The next day, the PD's supervisor of the murder task force came back, spoke with Boyd, and then informed the court that

> "If you were to reappoint our office, it would be an appointed attorney. **** We are the attorneys. We will be filing the motions. We will be making the arguments, and [Boyd] is no longer the attorney on the case. He has promised he would not file anymore motions. He would be playing the role of the defendant and he would allow the lawyers to be the lawyers in this case. Is that true, Mr. Boyd?"

After Boyd confirmed that it was, the court told him, "if I again appoint the [PD's] Office *** to represent you, I will not under any circumstances ever grant your motion to go *pro se* again. Do you understand that?" Boyd confirmed he understood, the PD's office was reappointed, and the case was continued so Boyd's new PD would have adequate time to prepare for trial.

¶ 16      On November 10, 2022, four days before his case was set for trial, Boyd filed a written *pro se* motion alleging ineffective assistance of counsel. In it, Boyd claimed his PD: 1) struck his *pro se* motions without having read them; 2) failed to communicate with him; 3) employed psychological tactics to persuade him to "cop out" and take a plea offer; and 4) failed to obtain contact information for defense witnesses. After hearing arguments from Boyd and his PD, the trial court found Boyd's allegations against his PD "unfounded and baseless" and "a stalling technique or an attempt to have you plead guilty and come back and try to withdraw your plea saying that you were forced." The court stated, "Respectfully, Mr. Boyd, this eleventh hour *Krankel* motion I find is a stalling technique is not going to stall your trial." The court added, "You

are going to have your trial Monday. I will not grant any further continuances. I do find counsel has made more than reasonable efforts to contact witnesses. This case is going to trial Monday."

¶ 17    Boyd's jury trial commenced on November 14, 2022. On November 18, 2022, the jury found Boyd guilty of first-degree murder, aggravated battery, and two counts of aggravated discharge of a firearm. Boyd's PD moved for judgment notwithstanding the verdict, but the court denied it and ordered a presentence investigation report (PSI). Boyd asked to address the court directly, but the court denied his request. Boyd stated, "Let the record reflect *** that I am objecting to this trial. I object ** to the jury instructions."

¶ 18    At a December 16, 2022, hearing, Boyd's PD said, "At this time Mr. Boyd is asking to address the Court and make some filings." Boyd stated,

> "I would like to tell you that it's a conflict of interest between me and my counsel, and I
> do not -- He fired. I don't want him to represent me no more. And it's not because of the
> jury verdict. It's really a conflict of interest, and we are not getting along. He is not
> communicating with me. He hasn't came to visit me. It's also other violations that -- I
> been calling him, trying to seek documents, trying to communicate with him. I called the
> supervisor, and no one is answering the phone for me. And I could not share with the
> attorney, and it's very vital to the defense to file certain filings, so I drafted the filings to
> file them in court because it's a time limit. I don't want to be time barred. I have 30 days
> to file certain motions, and I would like for them to go into my common law record."

The court informed Boyd it would consider his filings, but added,

> "Let me say something. As you know, because we have been going on for years, between
> you representing yourself and having another attorney, etc., that when you are
> represented by counsel, you are not allowed to make hybrid filings. Counsel has taken the

time to make a filing on your behalf, which I am going to consider, and I am giving your counsel a chance to file any supplement or amendment to that. I will ask your attorney to go over all these filings to see if he wishes to adopt them or not. I will also read them and address them on the next date. There is a lot of filings. They are long. I want to take the chance to read them without rushing. I am giving a date anyway to your attorney to file any supplement to his filings. So I will ask all the parties to read these additional filings between now and the next court date."

¶ 19    On March 29, 2023, Boyd filed a "Motion to Void Contract," which stated that he was withdrawing from any contract he made for counsel on September 21, 2022. He also filed a "Motion to Waive Attorney from Public Defender's Office," indicating that he was waiving representation "due to a chain of conflicts of interests within the rank of public defenders."

¶ 20    On May 4, 2023, the court held a *Krankel* hearing based on Boyd's allegations that his PD failed to visit and communicate with him, failed to contact and call critical witnesses to the stand, failed to enter his hospital records into evidence, limited his trial testimony, and failed to present an adequate defense. One of Boyd's PDs explained that he met with Boyd's cousin, Thedore Williams, but chose not to call him as a witness at trial after determining that "he would hurt our self-defense case given that he was sticking to [his] story" that he was at the shooting and the victim in this case did not have a firearm. The PD also explained that he and co-counsel went through trial strategy with Boyd, including asking for self-defense and lower offenses, and that Boyd "signed off on that" and that he and co-counsel met with Boyd post-conviction and discussed their strategy for post-trial motions. Boyd's other PD then testified and explained that they did not call Boyd's girlfriend as a witness because she never responded despite their repeated attempts to contact her, that they met with Boyd to discuss trial strategy and to prepare him to testify at trial,

and that he highlighted Boyd's bloody t-shirt for the jury so that they would understand the severity of his wounds.

¶ 21    May 10, 2023, Boyd filed a motion for ineffective assistance of counsel. In it, he asked the court "to appoint counsel outside of public defender's office due to several conflicts that may continue to have negative influences from attorneys from their office" and "to grant Mr. Boyd the opportunity to have a fair trial." The court declined Boyd's request to appoint outside counsel and proceeded to sentencing.

¶ 22    At a hearing on June 26, 2023, the court told Boyd it had reviewed all of his allegations regarding his attorneys. It stated,

> "You have no valid complaints on their decisions of trial strategy. They were successful in acquiring verdicts of not guilty, as to attempt first-degree murder of Yvonne Collins, attempt first-degree murder of Chicago Police Officer Ron Bialota and attempt first-degree murder of Chicago Police Officer Brian Halloran. However, the evidence against you at trial was overwhelming as to your guilt of each of the offenses for which you were convicted. This court finds that your multiple filings and claims of ineffective assistance of counsels are really displeasure at the jury's verdicts and not a true reflection of the efforts and performances of your attorneys. They are also renewed efforts to further stall the proceedings in this case. This court finds that your claims of ineffective assistance of trial counsels are completely baseless."

The court then denied Boyd's motion for a new trial and proceeded to sentencing. The State asked the court to consider Boyd's criminal history, the danger to the public and the need for deterrence, and urged the court to impose the strongest sentence available. The defense then presented Boyd's PSI as well as a mitigation report and asked the court to impose a sentence on the lower end of the

spectrum. After considering the facts of the case, the PSI, the mitigation report, Boyd's criminal history, and Boyd's potential for rehabilitation, the court sentenced Boyd to 90 years on both counts.

¶ 23                                   II. ANALYSIS

¶ 24    Boyd does not directly challenge his convictions or sentence on appeal. Instead, he asserts that the trial court reversibly erred when it denied his request to represent himself after trial, and that the trial court's *Krankel* hearing was insufficient. We will first address the self-representation issue.

¶ 25                              A. Standard of Review

¶ 26    We review a trial court's denial of a defendant's request for self-representation for an abuse of discretion. *People v. Rainey,* 2019 IL App (1st) 160187, ¶ 33; *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33. A court abuses its discretion only if its ruling is "arbitrary and without a logical basis." *People v. Hunt,* 2016 IL App (1st) 132979, ¶ 16. "Our mere disagreement with the court's decision would not make the decision an abuse of discretion." *People v. Fisher*, 407 Ill. App. 3d 585, 589 (2011).

¶ 27                     B. Defendant's Right to Self-Representation

¶ 28    "As a general rule, a criminal defendant has a constitutional right to represent himself if he makes an unequivocal request to do so." *Hunt,* 2016 IL App (1st) 132979, ¶ 16. This right is not without limits, however. *People v. Talidis,* 2023 IL App (2d) 220109, ¶ 41. A trial court may deny a defendant's request to represent himself if the defendant "abuses the right to waive counsel as a tactic to delay or disrupt proceedings." *Id.* (quoting *Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33).

¶ 29    To invoke his right to self-representation, a defendant's request must be knowingly and intelligently made, and the request must be both clear and unequivocal. *Hunt*, 2016 IL App (1st) 132979, ¶ 16; *Rainey*, 2019 IL App (1st) 160187, ¶ 44. Therefore, even when a defendant's request is clear, it "still may be viewed as equivocal." *Id.* ¶ 45. To determine whether a defendant's request to represent himself is unequivocal, the court "must look at the overall context of the proceedings and determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation." *People v. Hui*, 2022 IL App (2d) 190846, ¶ 39. If a defendant "changes his mind after trial begins, *or does so repeatedly at any stage*, a court may find that the conduct is manipulative or abusive in some other way. If so, the conduct can be considered vacillation, and a trial judge may find the request equivocal." *Rainey*, 2019 IL App (1st) 160187, ¶ 47 (quoting *Williams v. Bartlett*, 44 F.3d 95, 101 (2d Cir. 1994)) (emphasis in original). See also *People v. Mayo*, 198 Ill. 2d 530, 538 (2002) (the purpose of requiring a criminal defendant to make an "unequivocal" request to waive counsel is to "prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*.")

¶ 30    *People v. Rainey* is instructive. There, the defendant argued that the trial court erred when it denied his request to represent himself. 2019 IL App (1st) 160187, ¶ 2. We found that the trial court, who had "observed defendant's conduct first-hand for more than two years," did not abuse its discretion. *Id*. ¶¶ 52, 64. Based on the overall circumstances, we concluded that even though the defendant "clearly request[ed] self-representation," he did not unequivocally waive his right to counsel, because he "constantly waffled back and forth on the matter, whether inadvertently or strategically," and "request[ed] self-representation every time a legal ruling didn't go his way or every time a trial date approached, only to quickly change his mind upon being required to actually

14

undertake his defense without a lawyer." *Id.* ¶ 45. This "pattern of *temporarily* waiving counsel, only to ask for counsel back at the very next court date, made clear that he had no intention of seeing his own representation through." *Id.* ¶ 4. We reasoned that "[i]f a defendant could switch his sixth-amendment election whenever and as often as he liked, he could delay the trial proceedings at will, and in the extreme case, indefinitely. He could thus frustrate the effective prosecution of his case, by the simple expedient of changing, or purporting to change, his mind. The rights guaranteed by the sixth amendment may not be used as a weapon to cause delay." *Id.* ¶ 51.

¶ 31    In line with our reasoning in *Rainey*, we find that Boyd's request to proceed *pro se* after trial, although clear, was equivocal. Boyd waffled back and forth repeatedly for years. After he was appointed counsel in 2013, he was permitted to proceed *pro se* in 2016 after deciding that he no longer wished to be represented by the PD's office. The court admonished him that by electing to proceed *pro se*, he would be on his own "from start to finish" and "stuck with the consequences." After electing to do so, however, Boyd asked for the assistance of counsel no less than five times, telling the court on the eve of trial that he needed counsel because he "d[id]n't know how to do these proceedings," "d[id]n't understand these proceedings" and "d[id]n't know what [he was] doing." Ultimately, the court agreed to reappoint the PD to represent Boyd, but only after receiving assurances from him that he would "allow the lawyers to be the lawyers in this case" and informing him that it would "not under any circumstances ever grant [his] motion to go *pro se* again." The court evinced its belief that Boyd's waffling regarding representation was a "stalling technique" and "a ploy to negatively affect the effective administration of justice." Based on Boyd's constant pivoting back and forth here, we find that his request to represent himself after trial was not an unequivocal one. See *Mayo,* 198 Ill. 2d at 539 (finding that the defendant had not "clearly and

unequivocally" discharged his attorney "in light of defendant's previous equivocation and contradictory statements" including the fact that the defendant had requested that the public defender be reappointed after representing himself for only one week, "reveal[ing] equivocation on defendant's part regarding his desire to proceed *pro se*"); *cf. People v. Palmer*, 382 Ill. App. 3d 1151, 1163 (2008) (finding the trial court erred when it denied defendant's request for appointed counsel to assist him post sentencing where "nothing about the circumstances in this case \*\*\*\* suggest[ed] any abuse of the system"). Therefore, we find that the trial court did not err when it denied Boyd's request to represent himself after trial.

¶ 32                               C. *Krankel* Hearing

¶ 33    Boyd contends that the *Krankel* hearing conducted by the trial court was inadequate because the court "failed to adequately inquire into two claims that involved matters outside the record, thus failing to create a sufficient record necessary to address the particular claims on the merits." Whether the trial court properly conducted a preliminary *Krankel* inquiry is a legal question we review *de novo*. *People v. Roddis*, 2020 IL 124352, ¶ 33. "[I]f the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *People v. Jackson,* 2020 IL 124112, ¶ 98.

¶ 34    A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by our supreme court in *Krankel,* which encourages a trial court to fully address a defendant's claims in order to narrow the issues on appeal. *Roddis,* 2020 IL 124352, ¶ 34. The trial court should "first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court \*\*\* may deny the *pro se* motion." *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003).

"However, if the allegations show possible neglect of the case, new counsel should be appointed." *Roddis,* 2020 IL 124352, ¶ 35. The "operative concern" is "whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore,* 207 Ill. 2d at 78. This inquiry can be based on the trial court's "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 35    First, Boyd argues that the trial court erred when it failed to inquire further into his claim that his attorney was ineffective for failing to submit his hospital records. Boyd claims that because the hospital records show he was shot in the stomach, they "would have harmed the officers' credibility" and "increase[d] the likelihood the jury would have believed his testimony over the officers." Boyd bases this claim on his assertion that the officers testified that his "back was turned towards them at all times," but this misstates the officers' testimony. Officer Bialota testified that Boyd "turned towards [him] and point[ed] the gun at [him] when he fired" with his "body slightly to the right," Officer Halloran testified that Boyd "looked over his right shoulder turning his torso in [his] direction and point[ed] his arm and the gun in [his] direction," and Officer Spremo testified he remembered Boyd "turning his body, [and] firing the weapon" and Officers Bialota and Halloran returning fire after that. Because none of the officers testified that Boyd's back was "turned towards them at all times," the hospital records would not have undermined their credibility in any way. Therefore, the trial court correctly determined that this argument lacked merit.

¶ 36    Next, Boyd asserts that the trial court erred when it failed to inquire further and develop a sufficient factual record regarding defense counsel's failure to call Detective Scannell as a witness. He claims that Scannell's testimony could have "cast doubt on the testimony and credibility of

Officers Bialota, Halloran, and Spremo" because he "could have testified *** Spremo reported to him that he observed his partners initiate the shooting by the park entrance." However, nothing in Detective Scannell's grand jury testimony, which was attached as an exhibit to one of Boyd's *pro se* motions, supports Boyd's assertion. Scannell testified that his investigation, which was based on his "interviews with witnesses, [his] reports and evidence at the scene," revealed that Officers Halloran and Bialota "called out for [Boyd] to stop, but [Boyd] disobeyed and continued to walk away from the officers" and that Boyd then "removed a gun from his waistband and pointed it at the officers and discharged two shots at Officers Halloran and Bialota" before they returned fire. Scannell also testified that Boyd was "identified by other witnesses as the person who ran from the police after being ordered to stop," and that Boyd was the person that fired at the two officers. The court received Boyd's *pro se* motion, said it would "read all of it" and said it would "ask *** additional questions" if more information was needed. Because nothing in the record supports Boyd's assertion that the court did not conduct a proper *Krankel* hearing, however, we find Boyd's allegations insufficient on their face and, therefore, find no error.

¶ 37                                III. CONCLUSION

¶ 38    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 39    Affirmed.