# Illinois Official Reports

## Appellate Court

*People v. Owens*, 2018 IL App (3d) 150616

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OLLIE B. OWENS, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0616 |
| Filed | March 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 14-CF-279; the Hon. Cynthia M. Raccuglia, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Santiago A. Durango, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Karen Donnelly, State's Attorney, of Ottawa (Patrick Delfino, Lawrence M. Bauer, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

**OPINION**

¶ 1        A jury found Ollie B. Owens (defendant) guilty of domestic battery, and the trial court sentenced defendant to four years' imprisonment in the Illinois Department of Corrections. Defendant appeals his conviction on the grounds that the trial court improperly deprived defendant of his sixth amendment right to self-representation.

¶ 2                                                    FACTS

¶ 3        On August 5, 2014, the State charged defendant with home invasion pursuant to section 19-6(a)(2) of the Criminal Code of 2012. 720 ILCS 5/19-6(a)(2) (West 2014). On August 6, 2014, at defendant's request, the trial court appointed a public defender to represent defendant. On the same date, Michael Olewinski entered an appearance as defendant's appointed counsel.

¶ 4        On August 12, 2014, the State charged defendant by indictment with one count of home invasion pursuant to section 19-6(a)(2) of the Criminal Code of 2012. *Id.* Count I of the indictment alleged that between July 13, 2014, and July 14, 2014, defendant, knowingly and without authority, entered the dwelling place of Gina Stayton, having reason to know Stayton was present within that dwelling place, and intentionally caused injury to Stayton by grabbing her by the neck and punching her about the body. On August 21, 2014, defendant pleaded not guilty to the charge of home invasion.

¶ 5        On October 21, 2014, the State added a second count to the indictment, charging defendant with felony domestic battery pursuant to section 12-3.2(a)(1) of the Criminal Code of 2012. *Id.* § 12-3.2(a)(1). Count II of the indictment alleged that between July 13, 2014, and July 14, 2014, defendant knowingly caused bodily harm to Gina Stayton, a family or household member of defendant, by grabbing Stayton by the neck and punching Stayton about the body. The indictment further alleged that defendant had previously been convicted of domestic battery. On October 30, 2014, at a pretrial hearing, defendant pleaded not guilty to the felony offense of domestic battery.

¶ 6        On November 10, 2014, jury selection began, and the State dismissed count I. Prior to jury selection, the following exchange took place between defendant and the court:

> "THE DEFENDANT: Yes, ma'am. Can I ask you something?
>
> THE COURT: Sure.
>
> THE DEFENDANT: Is there any kind of way we can just work some probation out and forget about this jury?
>
> And between the Court, I would like to get my probation transferred to Tupelo, Mississippi. I would like to leave from here if I can, please.
>
> I ain't did anything wrong. I don't want to go to jury.
>
> THE COURT: Here. Here. Let me explain something to you, Mr. Owens, and I will give you some time.
>
> I am not involved in settlement negotiations, and I need to tell you why. Because I need to sentence you if you are found guilty in front of a jury, and I can't be bound by things.

But I can tell you that if you have been on probation before, I myself in sentencing you, would be if you are found guilty unlikely to consider probation. Particularly, since you have been on it before and you're eligible for an extended term.

Your only hope—you're presumed innocent—of working something out is not with me. Because I have to hear the evidence and then I have to make a decision.

By now, you should have had discussions with your lawyer about trying to work things out. I'm ready to bring a jury up.

Now, would you like to have some last minute discussions with your lawyer?

THE DEFENDANT: Yeah.

THE COURT: All right. I'll let you do that."

¶ 7      Following jury selection, on November 12, 2014,[1] the following exchange took place between defendant and the court:

THE COURT: "Now, I want to hear what the problem is because I never believe, Mr. Owens, it makes any sense to have someone represent yourself.

And if I tell this jury—I've told them all along he represents you. And the implication that you fired your lawyer is not going to look very good one way or another.

So, let's talk about this. What is the problem?

THE DEFENDANT: He's not defending me. He, my lawyer is against me, just like the prosecutor trying to convict me.

My lawyer workin' with him. Because ever since I have been fighting this case, your Honor, he been telling me I'm going to get some time on it.

And with the evidence that I have, you know, in my motion to discovery and stuff, him as my lawyer, ain't no way I should be able to get convicted.

THE COURT: Well, let's start out with this.

His job is to talk outside of my presence and to review the evidence in this case, Mr. Owens. And let's face it, you're presumed innocent.

And I think you're misunderstanding, because Mr. Olewinski is a good lawyer. But that's not—his job in front of me is to defend you at trial.

His job outside of my presence, and outside of the presence of the prosecutor, and we don't want to hear it, is to tell you what could happen to you.

Now, I advised you early on before the trial when I talked to you about what you faced, if, in fact—because I know your background and you're eligible for an extended term—if, in fact, you're found guilty then you may face time. Yes. If you are innocent, you don't have to worry about it. But him telling you—nobody knows what a jury is going to do, Mr. Owens. You know that. That's why we go to jury trial.

But if he's telling you that you may face time if you are found guilty, that doesn't mean he can't defend you at trial. That's a different thing.

Because it's true. You may face jail time if you are found guilty. If you are found not guilty, you don't have to worry about it.

---

[1]The record indicates that November 11, 2014, was a court holiday.

Do you understand what I'm saying? Don't, don't—what's the word? I'm trying to look for the word.

Don't confuse the words. Just because he has to tell you as your lawyer what you may face if you are found guilty, doesn't mean he can't defend you. That's his job. That's what negotiations—

That's why I'm not part of negotiations. No part of it. That's why I told you early on, I don't want to have anything to do with negotiations.

People shouldn't tell me because that's not my job. That's between lawyers, and in the privacy of your conversation with your lawyer. Because if you are found guilty, then I sentence you. And I don't want to know what the negotiations are. But your lawyer is here not only to defend you at trial, but to negotiate for you and tell you things that you may face.

Do you get that?

Do you understand that?

THE DEFENDANT: Yeah. I understand that, your Honor.

THE COURT: But, that doesn't mean he can't defend you. He's a good lawyer. And I think it makes no sense at this stage to not have him defend you.

THE DEFENDANT: But he's not going to defend me to the best of his knowledge. I know this because he done told me three or four times.

THE COURT: Mr. Olewinski, what is your response to that?

MR. OLEWINSKI: My response is that I have not told him that I was not going to defend him. I have told him potential penalties.

I have told him the likelihood of, my opinion of the likelihood of the outcome of the trial and what he would be facing.

And part of the complaints he's talking about is, does involve the negotiations that have been ongoing between Mr. Adams and myself. He's not happy with the progress of the negotiations.

And when I point out the negative parts of the case, the evidence against him, he believes that because I point those things out, that I am on the side of the State.

THE COURT: All right. Well, if that's how you're feeling, that's not true.

That's his job, Mr. Owens. And if you think, frankly, that he can create a miracle and you get probation—

Now that doesn't mean you won't get probation in a sentencing hearing. But with your criminal record, if you think—you can't force the State to give you something they don't want to give you.

So, we got a jury waiting. Do you or do you not want to proceed with Mr. Cappellini, or do you want to proceed?

MR. OLEWINSKI: Um—

MR. ADAMS: Olewinski.

THE COURT: I meant Olewinski. He's sitting here, Mr. Cappellini. So, I saw him walk in.

See, the mind works in strange ways.

Do you want to proceed here today?

Are you prepared to represent yourself here today?

THE DEFENDANT: No, because I don't know anything about the law.

THE COURT: Well, then what do you want to do?

THE DEFENDANT: Can I just let you make that choice? And we just waive the jury and I will go with a choice from you?

THE COURT: Would you go with Mr. Olewinski as your lawyer?

THE DEFENDANT: No. I go with your—I would rather for you.

THE COURT: Would you proceed here today, or would you need some time to prepare your case?

THE DEFENDANT: I need some time to prepare my case.

THE COURT: Would you waive a jury and then proceed with me pro se?

THE DEFENDANT: Yeah. That's what I do.

THE COURT: All right. Let's talk about that, though.

I need to know some more things about you, Mr. Owens.

First of all, what—I know your age. What is your level of education?

THE DEFENDANT: The eighth grade.

THE COURT: Okay. And now have you had any mental evaluations or any problems when it comes to counseling or mental issues?

THE DEFENDANT: Yes, ma'am. Quite a few.

You know, I don't comprehend too well and I'm hard of hearing.

THE COURT: You're hard of hearing, too?

THE DEFENDANT: Yes, ma'am. And then also my eyesight, it fails me.

THE COURT: All right. Well, you said you don't know anything about the law, either.

THE DEFENDANT: Right. I don't.

THE COURT: Well, you know, you're really not competent to represent yourself if you don't know anything about the law. Do you intend on learning some things?

THE DEFENDANT: Well, I ain't got no choice now behind this. I got to learn.

THE COURT: But are you—

Do you think that you are capable?

Now you understand that—how much.

What is his criminal history?

Help me with his criminal history, Mr. Adams, because I need to know his prior involvement in legal proceedings.

MR. ADAMS: And, Judge, also on a side note other than criminal history, it's my understanding that the defendant either can't read or has trouble with reading, too.

So, literacy may become an issue if he's going to try to get himself up to speed.

The defendant's criminal history includes a 1985 Robbery out of the State of Mississippi. He received a ten-year sentence, but that was suspended in some fashion.

I have a cert [*sic*] if the Court wishes to see it.

2002 Retail Theft, Class A Misdemeanor.

2003 Delivery of Controlled Substance, which he received a four year Department of Corrections sentence. So that should be within the ten years, rendering him extended term eligible on this case.

And a 2005 Domestic Battery, which would have come into play obviously in this case.

THE COURT: All right. Well, with all those problems, you're not competent to represent yourself, sir. You're just not competent.

So, I'm going to have you go with Mr. Olewinski because you can't read.

And you know what, I do have faith, no matter what he's told you and knowing this case, that he will present a good defense.

Now do you want—there's no way you can help yourself without you having the reading ability. And Mr. Olewinski does know a lot about your case.

Now the question is under the circumstances do you want to do it in front of a jury here today, or do you still want to waive a jury?

THE DEFENDANT: Could I go—

MR. OLEWINSKI: Your Honor, I don't mean to interrupt. But should we take a minute for me to discuss that with him since you are keeping me in the case?

THE COURT: Why don't we do that. I was going to do that, anyway. I wanted to talk to him myself.

* * *

MR. OLEWINSKI: Your Honor, at this time Mr. Owens has indicated that he wishes to proceed with a jury trial.

THE COURT: That's a good decision, Mr. Owens.

THE DEFENDANT: Okay.

THE COURT: And you need to proceed with Mr. Olewinski.

You're handicapped. I don't mean that negatively, but you can't read. And you need this help.

And, believe me, the things he's been telling you is because he wants you to be warned. It doesn't mean he's not going to give you a good defense.

So, having said that, then we have a Motion in Limine.

MR. OLEWINSKI: That's correct, your Honor.

MR. ADAMS: Judge, I don't mean to interrupt here, and I apologize for not getting this.

Before when we were bringing up this issue about the defendant representing himself and this is only, I'm only bringing this up because I want to make sure that any conviction on this case stands.

THE COURT: I understand.

MR. ADAMS: And I appreciate that everybody else wants to have that—

THE COURT: Yes.

MR. ADAMS: And likely, I wanted to make sure that the Court was aware that I was, or that I believe the defendant was unable to read. But the fact that he's able to capably represent himself isn't the standard.

And I went back to just make sure that that was the case. And so if you're making a finding that the defendant can make a knowing and intelligent waiver of his counsel this morning, that's what the record needs to reflect. Not that the defendant is incapable based on his education.

THE COURT: You are absolutely right, Mr. Adams, about that. And I can't make that.

I think he can make a knowing waiver. I just think there's a handicap.

You're right. He can make a knowing waiver because of the fact of his criminal history and his desire.

I don't think that his lack of reading, unfortunately, will prevent him from making a—I don't know about that.

You know, I have a problem. I'm going to put this in the record.

You know, the standard—let me explain to you.

Mr. Adams is pointing out to me, notwithstanding my stubbornness, and I am stubborn in this regard. And it's my experience that makes me stubborn, Mr. Owens.

Under the law, you have a right to represent yourself. And even though I may think that you are not capable of representing yourself because you can't read, that's not the standard. Or that you're not going to do a good enough job. The standard is whether you can make a knowing and voluntary waiver.

So, I have to get over my stubbornness, because I think it's a mistake for you to represent yourself, and proceed with some other questions here.

Mr. Adams is right.

Now, we need to go back to this. And I need to tell you that you need to understand in addition to your—let's talk about the mental treatment that you have had and the mental issues.

Have you been diagnosed with a mental condition, Mr. Owens?

THE DEFENDANT: Your Honor, it just, it just runs in my family. You know, that we never had no good education or nothing like that because I was born in a time back when it was hard to work.

We couldn't go to regular schools. We would have to go to the fields and stuff.

THE COURT: Okay. I understand that.

And do you understand now with that limitation, that presenting the defense is not as simple as telling one's story; but requires adherence to various technical rules, very technical rules governing the conduct of a trial?

It's going to be a problem for you in that you don't, you just told me you didn't know the law.

THE DEFENDANT: Right.

THE COURT: And you're not going to know the law. I'm going to make rulings you're not going to know.

Are you aware of that's [*sic*] going to happen?

And are you also aware that if you give yourself bad representation because you don't know the law, that the Appellate Court says that's not a reason to reverse any conviction that you receive?

Do you understand that?

THE DEFENDANT: (Nodded head.)

THE COURT: Would you like to change your mind about wanting to represent yourself?

THE DEFENDANT: Yeah. I don't know how to represent myself.

THE COURT: Okay. Then would you like to have Mr. Olewinski continue?

THE DEFENDANT: I have no choice.

THE COURT: You do have a choice. As stubbornly, as stubborn as I am, do you believe that you want to proceed with Mr. Olewinski?

THE DEFENDANT: Could I get another lawyer to represent me?

THE COURT: No. No. Well, you can hire another lawyer. But you can't get appointed another lawyer.

Let the record reflect that what I have heard so far why you can't get another appointed lawyer is you don't like what he has said to you; right?

THE DEFENDANT: Not, not only that. Him and, him and the prosecutor, they talk too much to one another.

THE COURT: But they are supposed to to [*sic*] try to work things out. They can do that.

That doesn't mean they are in collusion. Any lawyer for you would talk to the prosecutor.

I'm finding in this case that Mr. Owens is not capable of making a knowing waiver because, number one, he not only has educational issues that he's talked about, is he's admitted that he doesn't know how to represent himself.

He's admitted he doesn't know the law.

He and I, we have talked about what his complaints are about Mr. Olewinski. And I don't feel they lead to ineffective representation. And I just don't think he's capable of making a knowing waiver by law.

And for those reasons, I'm denying his request. And I am back to, yes, by his own comments he cannot make a knowing waiver.

Having said that, we will proceed and let's proceed on the Motion in Limine."

¶ 8    Following the presentation of evidence and the arguments of the parties, the jury found defendant guilty of domestic battery. On January 7, 2015, defendant filed a motion for a new trial, or in the alternative, a judgment notwithstanding the verdict.

¶ 9    On January 8, 2015, during the hearing on defendant's motion for a new trial, when asked whether defendant had any objections to his lawyer defendant stated "No. I ain't got no objections about Mike." The trial court then denied defendant's motion for a new trial.

¶ 10    On March 12, 2015, the trial court sentenced defendant to four years in the Illinois Department of Corrections. On April 6, 2015, defendant filed a motion to reconsider defendant's sentence. The trial court denied defendant's motion to reconsider on August 27, 2015. On that same day, defendant filed a timely notice of appeal. On September 28, 2015,

defendant filed an amended notice of appeal.

¶ 11                                  ANALYSIS

¶ 12        On appeal, defendant argues that the trial court's refusal to allow defendant to proceed *pro se* was based on an improper legal standard and requires a new trial. The sixth amendment grants defendants the right to enjoy the assistance of counsel, along with a concurrent and equally significant right to self-representation. *Faretta v. California*, 422 U.S. 806, 819-20 (1975). Before a court permits a defendant to waive counsel, the correct standard to be applied by the court requires the defendant to demonstrate to the court that the defendant can knowingly and intelligently relinquish the right to counsel. *Id.* at 835. Defendants must also make a "clear and unequivocal" request to waive counsel and proceed *pro se*. *People v. Burton*, 184 Ill. 2d 1, 21 (1998).

¶ 13        When determining whether a defendant's statement to discharge appointed counsel is clear and unequivocal, courts have looked to the overall context of the proceedings. *Id.* at 22. "A court must determine whether the defendant truly desires to represent himself ***." *Id.* Courts may look to defendant's conduct following the purported request to represent himself. *Id.* at 24. "Even if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel," such as by vacillating or abandoning an earlier request to proceed *pro se*. *Id.* at 23.

¶ 14        The trial court's decision on a defendant's election to represent himself will not be reversed absent an abuse of discretion. *People v. Rohlfs*, 368 Ill. App. 3d 540, 545 (2006). A trial court abuses its discretion only "where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Baez*, 241 Ill. 2d 44, 106 (2011).

¶ 15        This record reveals that defendant hoped his attorney could negotiate a deal for probation in exchange for a guilty plea. Defendant expressed his desire to avoid a jury trial. However, defense counsel's pretrial efforts to reach a plea agreement were unsuccessful. Consequently, the prosecution and the defense selected a jury. Following jury selection, defendant first raised the topic of proceeding *pro se* with the court.

¶ 16        Defense counsel informed the court that defendant was unhappy with the progress of plea negotiations. Defendant told the court that defense counsel was working against defendant. Defense counsel explained that defendant reached this conclusion because defense counsel discussed the negative aspects of defendant's case with defendant during the unsuccessful plea negotiations.

¶ 17        The court attempted to clarify defense counsel's role as defendant's attorney in terms defendant would understand. The court thoughtfully explained to defendant that defense counsel had a duty to explain the weaknesses and strengths of defendant's case to defendant and to discuss possible plea deals with the prosecutor. The court also carefully explained the serious nature of defendant's charge. Following this discussion with the court and defense counsel, the court asked defendant if defendant wished to represent himself for purposes of the jury trial on that day. Defendant replied, "No, because I don't know anything about the law."

¶ 18        Following comments by the prosecutor, the court had another conversation with defendant that emphasized the dangers and disadvantages of self-representation based on the nature of

the charge. During this exchange, the court explored defendant's criminal history and mental abilities. At this point, the court announced:

"Under the law, you have a right to represent yourself. And even though I may think that you are not capable of representing yourself because you can't read, that's not the standard. Or that you're not going to do a good enough job. The standard is whether you can make a knowing and voluntary waiver."

¶ 19 Then, the following exchange took place:

"THE COURT: And you're not going to know the law. I'm going to make rulings you're not going to know. Are you aware of that's [*sic*] going to happen? And are you also aware that if you give yourself bad representation because you don't know the law, that the Appellate Court says that's not a reason to reverse any conviction that you receive? Do you understand that?

THE DEFENDANT: (Nodded head.)

THE COURT: Would you like to change your mind about wanting to represent yourself?

THE DEFENDANT: Yeah. I don't know how to represent myself.

THE COURT: Okay. Then would you like to have Mr. Olewinski continue?

THE DEFENDANT: I have no choice."

¶ 20 Based on this unique record, we conclude that this defendant did not make an initial election to represent himself. However, the points made by the dissent are well taken, and we do not take issue with the dissent's reasoning or rational observations about a better approach in these cases. We agree the record can be read to support either the view expressed by our respected colleague in the dissent or the view expressed by the majority. Yet, the fact that the record lends itself to two different, but rational, interpretations of whether defendant truly intended to represent himself, evidences a lack of clarity in defendant's communication with the trial judge. Unfortunately, a confused defendant's ambiguous requests precipitated equal confusion within the mind of the trial judge regarding defendant's true intent.

¶ 21 We recognize defendant was uncertain, felt his attorney was not fighting for him, contemplated representing himself before the jury, and considered giving up his right to a jury trial in order to "go with" the trial judge. The transcript in this case reveals that defendant had confidence in the trial judge's impartiality and judgment.

¶ 22 However, after gathering information from the court, speaking to appointed counsel, and listening to the prosecutor's conversation with the judge, defendant made a decision to accept the services of appointed counsel. We conclude that after weighing his options, defendant did not intend to forgo his right to have appointed counsel represent him during the jury trial by clearly and unequivocally invoking his right to discharge his appointed counsel.

¶ 23 During these discussions with the court, we agree that the trial court originally misstated the legal standard that must be met before the court would allow defendant to discharge his attorney. After carefully reviewing the numerous exchanges between the court and defendant, we conclude defendant processed the information provided by the judge and voluntarily chose to continue to accept the services of appointed counsel for purposes of the jury trial he requested.

¶ 24 On appeal, defendant argues he should receive a new trial because the facts of this case are similar to the facts considered by the reviewing court in *People v. Fisher*, 407 Ill. App. 3d 585

(2011). We do not agree with defendant that this case is similar to *Fisher*. In *Fisher*, the defendant filed a written motion to discharge the assistant public defender and to represent himself. *Id.* at 586. The trial court denied the defendant's request. *Id.* at 589. On appeal, the State argued that the defendant's request to represent himself was unclear and equivocal because the defendant acquiesced to representation by counsel by answering the trial court's questions with " 'okays' " and " 'all rights.' " *Id.* at 590. In *Fisher*, the appellate court concluded that defendant said nothing to the trial court that could be reasonably interpreted by the trial court as a withdrawal of his written request to represent himself. *Id.*

¶ 25 Unlike *Fisher*, this record does not contain a clear, unwavering, written request to discharge appointed counsel. Further, in this case, defendant verbally responded to the court's questions, on multiple occasions, by affirmatively stating that he did not wish to represent himself.

¶ 26 Finally, in the interest of considering the overall context of the proceedings, the record on appeal reveals that during the hearing on defendant's motion for a new trial, prepared by defense counsel, defendant stated to the court that defendant was satisfied with appointed counsel's representation. Moreover, defendant's motion for a new trial did not raise an assertion that defendant was deprived of his right to self-representation. Based on this unique record, we conclude that the trial court did not improperly deny defendant his right to self-representation because defendant never made a clear and unequivocal request to proceed *pro se* following jury selection.

¶ 27                                         CONCLUSION
¶ 28 The judgment of the circuit court of La Salle County is affirmed.

¶ 29 Affirmed.

¶ 30 JUSTICE McDADE, dissenting:

¶ 31 The majority has found, after considering the totality of the pretrial hearing in this case, that the defendant did not make a clear and unequivocal statement of a desire to waive his appointed counsel and to proceed *pro se*. I acknowledge that the discussion can be reasonably perceived that way. I write separately, however, because the interchange is subject to a different and, in my opinion, equally reasonable reading, which supports vacating the sentence and remanding the matter to the trial court for further proceedings.

¶ 32 After complaining that he did not believe his appointed counsel was working solely in his best interest and about having his case tried to a jury, the defendant and the court had the following exchange:

"THE COURT: Do you want to proceed here today? Are you prepared to represent yourself here today?

THE DEFENDANT: No, because I don't know anything about the law.

THE COURT: Well then, what do you want to do?

THE DEFENDANT: Can I just let you make that choice? And we just waive the jury and I will go with a choice from you.

THE COURT: Would you go with Mr. Olewinski as your lawyer?

THE DEFENDANT: No, I go with your—I would rather for you.

- 11 -

THE COURT: Would you proceed here today, or would you need more time to prepare your case?

THE DEFENDANT: I would need some time to prepare my case.

THE COURT: Would you waive a jury and then proceed with me pro se?

THE DEFENDANT: Yeah. That's what I do."

¶ 33 That appears to me to be a pretty clear and definite statement that defendant wants to have a bench trial at which he would represent himself. The court acknowledges that is what he wants to do, saying, "All right. Let's talk about that, though."

¶ 34 At that point, the court's first obligation is to give the defendant the Rule 401(a) (Ill. S. Ct. R. 401(a) (eff. July 1, 1984)) admonishments, providing him the information the supreme court has determined he needs to ensure his waiver of counsel is a knowing and intelligent decision. Those admonishments do not appear in any form in the hearing transcript. After providing that information, the court could, and perhaps should, utilize any and all other available arguments to persuade the defendant that decision is unwise and he should proceed to trial with counsel. If that effort fails, the court, under existing law, must allow defendant to represent himself.

¶ 35 Rather than follow this procedure, the trial court launched into a confusing, rambling discussion with defendant, after which it found he could not waive his right because he could not read, had only an eighth grade education, and did not know the law. Upon being apprised by the state's attorney that it had used an improper standard, the court then found, on seemingly the same basis, that defendant could not make a knowing and intelligent waiver of counsel.

¶ 36 Under this interpretation of the facts, I would find the correct decision in this appeal is to vacate defendant's conviction and remand the matter for a new pretrial hearing with proper Rule 401(a) admonitions.

¶ 37 That said, I would like to take this opportunity to advocate for a change in how we deal with these cases. I believe the trial court's instincts were right. Defendant could not read, and he freely admitted he had no knowledge of the law. Nonetheless, he has, as the cases cited by the majority hold, a constitutional right to represent himself at his trial if he so chooses. So we parse every word said in court to divine whether or not he actually said, and steadfastly maintained, that he wanted to waive counsel and/or a jury. And if he does make such a foolish choice, the concerned trial court is then reduced to creating and injecting enough confusion into the proceeding that we can reasonably find defendant's election was unclear and/or equivocal.

¶ 38 We recognize that constitutional rights may be balanced when competing individual rights collide. There are, for example, societal limitations on constitutional rights where they cause unjustifiable harm: My right to speak freely does not protect my falsely yelling "fire" in a crowded theater (*Schenck v. United States*, 249 U.S. 47 (1919)); my right to speak freely does not protect my intentionally defamatory statements about another (*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)). A person who is mentally challenged may be found incapable of representing himself and required to proceed with counsel. *Indiana v. Edwards*, 554 U.S. 164, 176-77 (2008) ("Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial.").

¶ 39    The same reasoning should apply here. The right of an illiterate and uninformed defendant, unable to meaningfully represent himself because of functional rather than mental limitations, should not be permitted to undermine the integrity of the adversarial nature of the search for truth that undergirds our quest for justice. It should be fair inquiry for a court to assess whether such a defendant seeking self-representation possesses the ability to competently perform "trial tasks *** including organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury." *Id.* at 176 (citing *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984)).

¶ 40    If he lacks such ability, he should not be allowed to forgo counsel. A defendant may have a right to act unwisely and against his *own* best interests, but he or she should not have the right to ensure that the very essence of our judicial procedure is reduced to a nullity in his or her case.