2025 IL App (1st) 231932-U

No. 1-23-1932

Order filed December 30, 2025

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) ) | No. 18 CR 60345 |
| v. | ) ) | Honorable |
| BENJAMIN WILLIAMS, | ) ) | Diana L. Kenworthy, Judge Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant did not raise the issues argued on appeal in the circuit court and failed to establish prejudice to qualify those issues for plain error review. Affirmed.

¶ 2    Defendant Benjamin Williams (Defendant) appeals his convictions for first degree murder, attempted murder, and home invasion. He argues that the circuit court erred when it granted defense counsel's motion to withdraw and allowed defendant to represent himself, as he had previously been found unfit to represent himself and no new evidence on that subject

had been presented. Additionally, he argues that the circuit court relied on evidence outside the record to make a credibility determination regarding one of the expert witnesses and therefore his case should be remanded for a new trial. As these issues are not properly before this court, we affirm his convictions.

¶ 3                                    I. BACKGROUND

¶ 4        On March 23, 2018, Peggy Goodman (Peggy) was shot to death and her granddaughter, Samaria Goodman (Samaria) was stabbed repeatedly in the home the two shared. Defendant, an ex-boyfriend of Samaria's, was arrested the same day.

¶ 5                          A. Defendant's Fitness to Self-Represent

¶ 6        Defendant repeatedly insisted that he be allowed to represent himself. On December 10, 2018, he told the judge who initially presided over the case that the assistant public defender assigned to him did not represent him or speak on his behalf. The court continued the matter because a behavioral clinical exam (BCX) was pending at the time. On January 16, 2019, defendant again asked to represent himself. The court informed defendant of the potential consequences of choosing to represent himself but again continued the case because the court did not yet have access to the notes from the BCX. On March 5, 2019 the circuit court delivered the required admonishments required by Illinois Supreme Court Rule 401. Ill. S. Ct. R. 401 (eff. July 1, 1984). Defendant accepted that he would be at a disadvantage but still declared his intent to proceed with representing himself.

¶ 7        On September 16, 2019, following the previous judge's retirement, a new judge was assigned to defendant's case. As the new judge was unable to locate transcripts of the previous Rule 401 admonishments, the court repeated those admonishments to be certain that they had been delivered. During that exchange, defendant mentioned that he had been found

incompetent to stand trial twice in federal cases. The court ordered a second BCX be undertaken focusing on defendant's fitness to represent himself rather than only his fitness to stand trial.

¶ 8 On December 3, 2019, the circuit court held a fitness hearing at which Dr. Matthew Markos (Markos), the Director of Forensic Clinical Services, testified. Markos explained that his attempt to assess defendant was unsuccessful, but that was the result of volitional behavior on defendant's part. In Markos' words: "He can cooperate if he wants to and he's fit because he has no mental illness, so there's a difference over here. His lack of cooperation is not the product of a mental illness rather than it's his own personal belief and choice." Markos testified that he had examined defendant in 2013 in connection to an unrelated case, and at that time, defendant was able to give clear answers about the functions of various courtroom officials and basic legal terminology. Defendant had previously been diagnosed with schizophrenia and had been prescribed antipsychotic medication as a result. Despite the fact that his attempted interview lasted only 20 minutes, Markos stated that it was, in combination with the records to which he had access, enough to form an opinion. Markos diagnosed defendant with alcohol abuse disorder, stimulant use disorder, cannabis use disorder, and unspecified mood disorder.

¶ 9 Markos concluded that defendant was not fit to represent himself, but was fit to stand trial, assuming he had legal counsel and was taking his medication. Markos explained that although defendant was not currently manifesting any symptoms of mental illness, "given his deficits, which include eighth grade education, history of psychotic mental illness, i.e. schizophrenia, and his learning disability and educational deficits that he's simply not fit to represent himself in a court of law."

¶ 10      Defendant interrupted Markos' testimony multiple times to interject and, after being admonished regarding proper courtroom procedure, defendant declared his intention to continue interrupting. Defendant was eventually removed from the courtroom. After Markos' testimony, defense counsel requested the opportunity to bring in their own expert to examine defendant and offer a second opinion. With that in mind, the court declined to make a ruling that day and continued the case pending that assessment.

¶ 11      On March 16, 2021, after some delays due to the Covid-19 pandemic, the hearing that began December 3, 2019, continued. Dr. Carolyn Shima (Shima), who had been retained by defense counsel, testified that she had met with defendant for a total of two hours and 45 minutes. Shima diagnosed defendant with "unspecified personality disorder with mixed narcissistic, paranoid, and antisocial personality traits, and delusional disorder." Shima stated that she shared her screen with defendant and he read a legal document to her aloud with "some minor errors." He was then able to paraphrase the meaning of the document in broad terms, but "became somewhat difficult to understand when discussing the fine details of the document."

¶ 12      Shima testified that she administered the Georgia Court Competency Test, which she described as "designed to assess a person's understanding of general court procedure, the understanding of the roles of the people within the courtroom such as the judge or the jury or the prosecutor." It additionally assesses an individual's ability to assist their attorney in their defense and "their understanding of charges, legal sentences, and potential outcomes." Shima further stated: "I think the last portion of that exam is to discuss the circumstances leading up to their arrest and the determination of how coherent their response is." The test is scored 1-100, with a score of over 70 being "supportive of a finding of fitness to stand trial if the

person's making a genuine effort." Defendant's score was 84. Shima stated that she believed the test weakest at assessing an individual's ability to assist their attorney, as the questions are "basically just identifying who their attorney is, how do they reach them, and how do they feel about them." That was also the area in which defendant struggled.

¶ 13    Shima testified that defendant had "an unshakable belief that he has a right to represent himself" and "truly believe[d]" that his attorney and the judge were working against him. When asked about malingering, which is to say fabricating or exaggerating symptoms to achieve a desired outcome, Shima stated that defendant had a recorded history of "malingering psychotic behaviors." She did not think he was malingering in this instance, especially as his behaviors were "really potentially detrimental to his case and it would be a rather roundabout and dangerous way to be accomplishing that goal."

¶ 14    Markos felt that the delays in obtaining Shima's second opinion rendered his assessment "stale" and suggested that Forensic Clinical Services perform a new evaluation. That new assessment was performed by Dr. Brian Curran (Curran) across two sessions on March 30, 2021 and May 6, 2021. Curran had examined defendant previously across two sessions in 2018. Curran testified that during the March 30, 2021 session, defendant seemed "organized but irritable" and "like he was not interested or invested in participating in the evaluation." Defendant asked for Curran's name so that he could write it down, then abruptly wished Curran a nice day and ended the video call. Curran made a second attempt at evaluating defendant on May 6, 2021. Defendant "made logical comments, including asking the examiner if 'your boss got my letter.' " Defendant "presented as oppositional, informed the examiner to 'stop asking me silly ass questions' before abruptly standing from the computer screen stating 'have a nice day' and then leaving the examination room."

¶ 15    Curran stated that he was unable to properly evaluate defendant but considered his lack of cooperation to be "volitional in nature and not the product of primary mental illness," considering that defendant was able to spend a total of nearly three hours speaking with Shima without issue. Curran further noted that defendant's health records indicated that he was not prescribed any psychotropic medication and was "consistently referred to as psychologically stable" with "no evidence or indication of delusional thinking or other significant symptoms of mood or psychotic mental illness." Curran's conclusion, however, was that he could not render an opinion on defendant's soundness to stand trial or to represent himself.

¶ 16    On September 7, 2021, the court found defendant fit to stand trial, but unfit to represent himself, stating:

> "As Dr. Markos opined, it is the combination of intellectual challenges coupled with mental health issues that results in [defendant] being unfit to represent himself. This Court agrees. As made clear in *Indiana v. Edwards*, 554 U.S. 164, [a] 2008 case from the U.S. Supreme Court, the right to self-representation is not absolute.
>
> ***
>
> This Court has had the opportunity to observe and interact with [defendant] for over two years. He is well aware of the charges against him, the roles of the various personnel in this courtroom, and the various pieces of evidence that exist in this case. In fact, the last time we were in court, he asked me about some discovery that he believes exists but had not been tendered.
>
> [Defendant] can be cooperative when he chooses to. He cooperated with the defense expert for the first two interviews. More often than not, he cooperates with

the Court. It is when he believes this Court or his attorney are not doing his bidding that he becomes oppositional.

\*\*\*

[A]fter considering the testimony of the three professionals that testified regarding this matter, my review of documents provided to the Court, the arguments of the parties, and this Court's interactions with [defendant] over the past two years, I find that [defendant] is fit to stand trial but is not fit to represent himself."

¶ 17      On June 9, 2022, defendant again requested to represent himself in a handwritten document labeled "Affidavits To Proceed Pro-Per/Pro-Se." The court denied that motion in a short hand-written order on June 22, 2022. The court did not further explain its continued denial, except to mention the previous ruling.

¶ 18      On November 28, 2022, defendant's assistant public defender filed a motion to withdraw from the case. On October 22, 2021, defendant refused to meet with her when she went to the county jail to speak with him. On November 22, 2021, defendant refused to appear in court for a scheduled appearance. On July 25, 2022, defense counsel was able to hold a short conversation with him before he walked out. On October 6, 2022, defendant threatened to spit on her in order to "get her off the case." Defense counsel argued that Markos' education-related reasons for judging defendant unfit to represent himself did not comport with case law, which was concerned only with whether mental illness prevented the individual from being able to adequately represent himself.

¶ 19      On November 30, 2022, the circuit court granted defense counsel's motion to withdraw. The court first set out the context, that defendant had been ruled unfit to represent himself September 7, 2021, and that he, and more recently his counsel, had been reiterating his desire

to represent himself before and since that date. The court's ruling, which we quote at great length, as it is the integral decision in this case, was as follows:

"In preparing for arguments—or my ruling on counsel's motion, I have gone back and re-read the cases that I cited in my earlier ruling, and I have read additional cases. I ha[ve] spoken to colleagues. I have reread the transcripts from the fitness hearing.

In my 2021 hearing I cited *Indiana v. Edwards*, 554 US 164 2008; however, my earlier interpretation of the US Supreme Court's ruling was not entirely accurate. [*Edwards*] simply stands for the proposition that the Constitution does not prohibit states from [insisting] upon representation by counsel for those competent enough to stand trial, but who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

[Defendant] has been evaluated by Forensic Clinical Services on numerous occasions, both in this case and in another case. Each time he has been found fit to stand trial.

The Court will also note that the defense had an outside expert, Dr. Carolyn Shima, evaluate [defendant]. Unfortunately, Dr. Shima was later found to have made serious errors in her evaluation report regarding another defendant appearing in this courtroom. Her lack of judgment in that case was such that her opinions in this case will no longer be considered.

At the fitness hearing, Dr. [Markos] testified that defendant was not currently manifesting any mental illness or symptoms of mental illness which would impact his fitness to stand trial; however, Dr. Markos' opinion was that while [defendant] was fit to stand trial, he was not fit to represent himself.

He based his opinion on [defendant's] lack of education past 8th grade although the Court has heard other testimony that [defendant] has received a GED. He based his opinion on [defendant's] learning disability and a history of a psychotic mental illness, that being schizophrenia. Dr. Markos placed a great deal of emphasis on [defendant's] lack of an education and the pitfalls of that in representing himself.

In addition, he opined that any lack of cooperation from [defendant] with his counsel was volitional rather than as a result of mental illness. While the Court has tremendous respect for Dr. Markos, at the end of the day, it is the Court's job to interpret the law and apply it to the facts before me.

I have reviewed several cases regarding the right to self-representation. In *People v. McNutt*, which is 2020 Ill. App. 1st 173030, the First District noted that *Edwards* applies only to those cases where the defendant exhibited, quote, severe illness, end quote, that would impact his ability to represent himself at trial.

That is not the case here. Dr. Markos testified that [defendant] was not currently manifesting any mental illness or symptoms of mental illness that would impact his fitness to stand trial. Instead, Dr. Markos primarily concentrated on [defendant's] educational and learning deficits as a reason for recommending he was unfit to represent himself."

¶ 20    The court went on to review several cases discussing the matter before concluding:

"At this time, I am going to reverse course and admonish [defendant] once again regarding self-representation. He is not currently experiencing a severe mental illness and has been found fit to stand trial. He has a fundamental right to represent himself no matter how unwise I think his decision is. If I find that he can knowingly,

9

intelligently, and voluntarily waive his right to counsel, then I will allow him to represent himself."

¶ 21    The court admonished defendant and granted the public defender's motion to withdraw.

¶ 22                                   B. Trial

¶ 23    As the facts of the case have no bearing on the matters before this court on appeal, we only briefly recount them.

¶ 24    Samaria testified that on March 23, 2018, she saw defendant while she was in a local beauty supply store. Defendant, whom she had dated for a few months the previous year, looked surprised to see her. On her way home, Samaria saw Kyron Thomas (Thomas), whom she had known growing up. Samaria was upstairs in her room and was on the phone with a friend when she heard her grandmother, Peggy, talking to someone downstairs. Peggy called up to Samaria that there was someone named Glen at the door to see her. Samaria responded that she did not know anyone by that name. Samaria then heard her grandmother say "you can't go up there," followed by a loud pop.

¶ 25    Samaria left her room and saw someone wearing a hoodie "approaching her stairs" with a metallic gun in their hand. Samaria closed herself in her room and sat with her back against the door to hold it shut. While she did so, someone outside the door fired multiple bullets through the upper portion of the door. Samaria eventually moved away from the door to get her phone and dial 911. While she was doing so, the intruder pushed his way in and pulled her to her feet by her hair. She identified the intruder as defendant and pointed him out in court. Defendant put the gun to her head and pulled the trigger twice, but it only clicked each time.

¶ 26        Samaria testified that defendant let her go and went back downstairs, but she was in shock, so she sat down where she was and did not move. While she sat there, Thomas, the co-defendant in this case, came up the stairs. Thomas held her in an embrace "[l]ike a bear hug" and "motioned with his fingers to his lips for [Samaria] to stop screaming." Soon, defendant returned and "passed something" to Thomas. Samaria felt a pain in her back and saw that Thomas had stabbed her. She began to struggle and defendant cut her with "like a box cutter or some type of blade," but the blade got stuck and he did not try again.

¶ 27        Defendant instructed Thomas to "[s]tab that bitch in the face." While Thomas attempted to "poke her in the face," Samaria covered her face with her hands and managed to get to the door out of her room. Samaria tried to throw herself down the stairs, but was not successful, as Thomas was holding her hair and defendant was holding her clothing. Thomas began to stab Samaria in the head while defendant beat her about the head and ears with the gun. Samaria eventually made it to the bottom of the stairs and crawled under a table, where she "tried to play dead." Defendant instructed Thomas to cut her throat in order to ensure she was dead, as the two of them would otherwise go to jail. Thomas attempted to comply, but Samaria "moved [her] hand where [her] throat was" such that Thomas only ended up cutting her hand. Defendant and Thomas both fled out the front door.

¶ 28        Samaria locked the front door and searched for a phone to call 911 but had difficulty due to the mess that had been made during the struggle and because she was beginning to feel very dizzy. She ultimately found a phone at the bottom of the stairs that she later learned was Thomas' phone, which she used to dial for help. Samaria was taken to Stroger Hospital, where she was treated for a punctured lung resulting from the box cutter and where she was given numerous stitches for over 20 stab wounds. Samaria also suffered a "busted ear"

requiring stitches "inside and out," as well as some damage to her liver. When asked, Samaria denied ever hearing Thomas threaten or coerce defendant. She stated that Thomas never said a word during the entire encounter.

¶ 29    Cortesha Carter (Carter) testified that she was defendant's girlfriend at the time of the offense. Defendant stayed over with Carter the night before the offense and assured her when he left the following morning that he would be back to take her to class. Carter went back to sleep and woke again later in the day to find defendant sitting on the edge of her bed. When she told him she was going to get ready for class, he responded with "gibberish talking, but it was like I'm not going to see him no more." A moment later the doorbell rang, and when Carter and her mother answered the door, Carter saw "[a] bunch of police officers." Carter was shown photographs of the clothing defendant was wearing at the time of his arrest and confirmed that it was clothing she had seen him wear. Carter had the opportunity to listen to an audio recording containing multiple voices. She identified defendant's voice as the one that said "[g]o get her, open the door" and "[i]n her neck, kill her man," among other things.

¶ 30    Lori Larimore (Larimore), Carter's mother, testified that defendant would often spend the night at the home where she lived with her grandchildren and Carter. On the morning of the offense, Larimore saw defendant in the kitchen wearing gold-colored jeans and a hoodie. She later found those gold jeans in Carter's bedroom and placed them in a trash bag to give to the police.

¶ 31    A pair of shoes was also recovered from Larimore's home and a knife was recovered from Samaria's home. Testimony from police officers and technicians who recovered and examined the pants, shoes, and knife established that all three had blood on them. Testing

showed Samaria as an extremely likely contributor to the blood on all three items. The State rested its case.

¶ 32    Defendant cross-examined witnesses throughout the State's case in chief, called witnesses of his own, filed motions with the court, and took the stand to testify in his own defense. He was subject to frequent objections from the State and admonishments from the court when he exceeded the bounds of the Rules of Evidence. On multiple occasions, the court had the jury leave so that it could speak to defendant outside of their hearing in instances when defendant continued to speak out of turn or insisted on violating the Rules of Evidence by, for instance, introducing hearsay. During the State's cross-examination of defendant, when he was shown a surveillance video, he insisted he had never seen it before, became agitated, and refused to stop speaking until the court sent the jury out of the courtroom and sent defendant back to lockup during a ten-minute recess.

¶ 33    After defendant was returned to the courtroom, he continued to insist that he had a First Amendment right to speak regardless of the court's rules, and the court warned him that if he said anything that was not a response to a question he was asked on cross-examination, the court would again send the jury out and would exclude defendant from the courtroom for the remainder of the trial. While the court confirmed with the State how the trial was going to proceed, defendant continued speaking over the court and the State until the court had him removed to "the back," where he could listen to proceedings without participating directly. The court stated for the record that it made multiple attempts to get defendant to comply and that it felt a contempt finding would be of no use considering the gravity of the charges and accompanying sentences defendant was facing.

¶ 34    The court took a recess for lunch, after which it once again returned defendant to the stand and instructed defendant on the need to follow the court's rules. Upon defendant's return to the stand, the State finished its cross-examination of defendant with relatively few issues. Defendant spoke again in rebuttal but refused to rest his case because he had witnesses and evidence he still wanted to present. After a discussion, with the jury out of the courtroom, it was established that he had no valid basis on which to call his witnesses and the evidence he wanted to present had already been presented. He was, however, able to have the evidence entered as an exhibit with some helpful input from one of the prosecuting attorneys. Defendant was able to describe at length and request various clips from videos that he wanted to play for the jury during his closing argument. Defendant was nearly removed from the courtroom again during the State's closing argument but controlled himself enough to remain and make his own closing argument. Defendant remained in the courtroom with very little issue for the remainder of the trial, though he continued to comment on various ways in which he believed the court was depriving him of his rights or influencing the course of the trial.

¶ 35    The jury found defendant guilty of all the charges against him. With defendant's consent, the court reappointed the assistant public defender for post-trial motions and sentencing. Defense counsel filed a motion for a new trial. Defendant then asked to represent himself again and, after he was admonished again and his attorney was granted leave to withdraw, defendant filed his own post-trial motions. The court sentenced defendant to 65 years' incarceration with the Illinois Department of Corrections for first degree murder, 30 years for attempted murder, and 30 years for home invasion, for a total of 125 years' incarceration.

¶ 36                                                II. ANALYSIS

¶ 37         Defendant argues on appeal that the circuit court (1) abused its discretion when it found

defendant fit to represent himself, (2) violated defendant's right to due process when it

reconsidered its fitness decision without holding another fitness hearing, and (3) violated

defendant's right to due process when it considered evidence outside of the record in making

its fitness decision. Defendant did not raise any of these issues below, and they are therefore

forfeited on appeal. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). That said, defendant asks

that we review them under the plain error standard.

¶ 38         "[T]he plain-error doctrine allows a reviewing court to consider a forfeited, but still clear

and obvious, error in two limited circumstances: (1) where the defendant's conviction may

have resulted from the error, not the evidence, or (2) where the defendant's conviction

resulted from a flawed process, despite the evidence." *People v. Williams*, 2022 IL 126918,

¶ 55. "Stated differently, the plain-error doctrine applies in cases involving 'prejudicial

errors—errors that may have affected the outcome in a closely balanced case' or in cases

involving 'presumptively prejudicial errors—errors that may not have affected the outcome,

but must still be remedied.' " *Id.* (citing *Herron*, 215 Ill. 2d at 185). Plain-error review is "a

narrow and limited exception to the general waiver rule, whose purpose is to protect the

rights of the defendant and the integrity and reputation of the judicial process." (Internal

quotation marks omitted) (Internal citations omitted) *Herron*, 215 Ill. 2d at 177.

¶ 39         Defendant argues here that his arguments fall under the second prong of the doctrine,

which allows for review in spite of forfeiture where "the error is so serious that the defendant

was denied a substantial right, and thus a fair trial." *Id.* at 179. In *Crespo*, our supreme court

made clear that affecting a substantial right alone is insufficient; the error must also be

prejudicial to the defendant by "seriously affect[ing] the fairness, integrity, or public reputation of judicial proceedings." *People v. Crespo*, 203 Ill. 2d 335, 348 (2003).

¶ 40        Our supreme court in *Crespo* declined plain error review where the evidence in the case was so overwhelming that the error resulted in no prejudice to the defendant, despite a substantial right being implicated. *Id*.; *People v. Cotton*, 535 U.S. 625, 632-33 (2002) (same). Here, there is no question that a substantial right is implicated. A criminal defendant is entitled to representation by competent counsel. U.S. Const., amend. VI, U.S. Const., amend XIV; see also *Gideon v. Wainwright*, 372 U.S. 335 (1963). This is the case whether we view the alleged error as allowing his assigned counsel to withdraw or allowing defendant to represent himself despite being incompetent to do so..

¶ 41        However, defendant did not establish prejudice. Defendant does not directly and specifically address the requirement that he show prejudice, but he twice mentions that he was prejudiced. In the first instance, defendant argues: "If this court were to engage in a prejudice analysis, reversal is required. Dr. Shima and Dr. Markos concluded that [defendant] suffered from mental conditions that rendered him incompetent to represent himself at trial." Even were we to agree that defendant's ability to represent himself at trial suffered due to his mental conditions, that alone does not demonstrate prejudice. The evidence against defendant was overwhelming. The surviving victim, Samaria, knew defendant personally and identified him. The defendant's girlfriend at the time, Carter, identified his voice on telephone call recordings. Shortly after the offense, clothing bearing Samaria's blood was found in the home where defendant was staying. The timing of defendant's coming and going from that home, as well as his behavior after the offense, match the course of events presented by the

State's witnesses. Defendant does not argue that the result of the trial would have been different, had defendant's attorney been kept on the case.

¶ 42    Defendant touches on prejudice in his brief a second time when he argues: "[T]he expert testimony, as well as [defendant's] behavior leading up to, and during, trial illustrated the clear error and prejudice resulting from the trial court reversing its fitness ruling based on matters outside the record and without conducting a contemporaneous fitness hearing." A thorough review of the transcripts shows that although defendant was removed from the courtroom during trial, he did not miss any portion of the trial as a result. Defendant was disagreeable and disruptive. At times his protestations and his lack of understanding of the law, of the rules, and of courtroom decorum ground the proceedings to a halt while the court grappled with the difficult task of informing defendant where he had erred without serving as his legal counsel. However, such a struggle is common for *pro se* litigants, and this court does not see that it produces any prejudice that is so clear that it requires no explanation from defendant.

¶ 43    Dr. Markos and Dr. Shima found defendant to be unfit to represent himself. Dr. Markos stated that "given [defendant's] deficits, which include eighth grade education, history of psychotic mental illness, i.e. schizophrenia, and his learning disability and educational deficits that he's simply not fit to represent himself in a court of law." A lack of education and difficulty reading are certainly impediments to overcome in representing oneself in a court of law, but they are not so significant as to outweigh defendant's constitutional right to self-representation. *People v. Owens*, 2018 IL App (3d) 150616, ¶ 23 (holding that the illiterate may elect to represent themselves). A diagnosis of schizophrenia without details of specific manifestations that would interfere with a defendant's ability to understand

17

something about the world or the courtroom directly of concern in representing oneself in court is also insufficient to overcome the weight of defendant's constitutional right. *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 51 (holding that the trial court abused its discretion by denying defendant's request to represent himself due to his schizophrenia diagnosis).

¶ 44        Dr. Shima opined that defendant's narcissism led him to believe he was "as good as any lawyer" with regard to legal acumen. When referencing defendant's delusional beliefs, she again referred to his belief "that he is as good as any attorney" and that he believed the State and the judge to be working against him and tampering with evidence. Here, we refer back to our commentary on Dr. Markos' opinions: Even if defendant was truly delusional regarding his legal ability, that delusion is not one that is inherently prejudicial to him if he is allowed to represent himself. Dr. Shima also believed his ability to "conduct himself appropriately within a meeting or within the court" to be significantly hampered. This prediction does indeed play out in the transcript, yet defendant was able to represent himself at trial from beginning to end, with the benefit of significant and admirable patience from the court. Defendant does not articulate any specific ways in which he was prejudiced, and we see no prejudice so clear that it needs no articulation.

¶ 45        As a final matter, we address the general nature of the expert witnesses' testimony and defendant's arguments on appeal in this case. What constitutes "mentally fit to represent oneself in a court of law" to a layman or a mental health professional is likely quite different from the more restrictive legal meaning of that phrase. The legal question is not whether defendant will do a good job of representing himself, or whether defendant will even do a passable job, or even whether defendant will do better than abysmally. The question is

18

whether the defendant is sufficiently mentally sound to waive his constitutional right to counsel. *Godinez v. Moran*, 509 U.S. 400-01 (1993) ("[I]n order to waive the right to counsel, a defendant must both be competent to do so and knowingly and voluntarily waive the right."). In *Indiana v. Edwards*, which defendant cites extensively, the Supreme Court permitted states to insist upon representation by counsel for those defendants who fall into a so-called "gray area" where they are fit to stand trial under *Dusky*, but where a "realistic account of the particular defendant's mental capacities" shows that he is not mentally competent to represent himself. *Edwards*, 554 U.S. at 177-78; see also *Dusky v. U.S.*, 362 U.S. 402 (1960).

¶ 46 Under Illinois law, as stated above, an illiterate person is not inherently mentally incompetent. An uneducated person is not inherently mentally incompetent. A person suffering from schizophrenia is not inherently mentally incompetent. It is no surprise that psychiatric professionals thought defendant was unfit to represent himself, given the difficulties he would and did face in doing so. However, there is a vast gap between the point at which someone ceases to be truly effective at self-representation and the point at which the law determines someone to be so mentally incompetent that we find it acceptable to deprive him of his constitutional right to self-representation.

¶ 47 Defendant failed to establish that prejudice resulted from the court's alleged errors, therefore his arguments do not qualify for plain error review and are forfeited.

¶ 48 III. CONCLUSION

¶ 49 For the foregoing reasons, we affirm defendant's convictions.

¶ 50 Affirmed.